# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,

*Plaintiff-Appellant*,

*v.*

UNITED STATES DEPARTMENT OF JUSTICE,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the District of Columbia, No. 1:19-cv-3626-DLF
Before the Honorable Dabney L. Friedrich

## OPENING BRIEF FOR PLAINTIFF-APPELLANT

NIKHEL S. SUS
CITIZENS FOR RESPONSIBILITY AND
   ETHICS IN WASHINGTON
1331 F Street NW, Suite 900
Washington, DC 20004
(202) 408-5565

JESSICA A. LUTKENHAUS
ARI HOLTZBLATT
YOSEPH T. DESTA*
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

*\* Admitted to practice only in California.
Supervised by members of the firm who are
members of the District of Columbia Bar.*

March 22, 2022

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Plaintiff-appellant Citizens for Responsibility and Ethics in Washington ("CREW") makes the following certification:

## A.     Parties And Amici

Plaintiff-appellant CREW appeared in the district court and is a party in this Court.  CREW is a non-profit, non-partisan organization organized under section 501(c)(3) of the Internal Revenue Code.

Defendant-appellee the U.S. Department of Justice appeared in the district court and is a party in this Court.

No amici appeared or participated in the proceedings below, and as of this filing there are no amici in this Court.

## B.     Rulings Under Review

This appeal is from the Memorandum Opinion and Order entered by Judge Dabney L. Friedrich on September 30, 2021, Joint Appendix ("JA") 409-410, which granted in part and denied in part the U.S. Department of Justice's motion for summary judgment, JA20, and granted in part and denied in part CREW's cross-motion for summary judgment, JA210.  The district court's Memorandum Opinion is not published in the Federal Reporter but is available at 2021 WL 4502039, and at JA410.  The district court's Order is unpublished and is available at JA409.

**C.     Related Cases**

This case has not previously been before this Court.  Counsel is unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

## CORPORATE DISCLOSURE STATEMENT

CREW has no parent company, and no publicly-held company has a ten percent or greater ownership interest in CREW.

CREW seeks to empower citizens to have an influential voice in government decisions and in the government decision-making process through the dissemination of information about public officials and their actions. To advance its mission, CREW uses government records made available to it under the Freedom of Information Act, 5 U.S.C. § 552.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ....................................... iii

TABLE OF AUTHORITIES ...................................................... vi

GLOSSARY ....................................................................... xii

INTRODUCTION .................................................................1

JURISDICTIONAL STATEMENT ..........................................3

STATEMENT OF ISSUES ...................................................4

RELEVANT STATUTES AND REGULATIONS...........................4

STATEMENT OF THE CASE.................................................4

    A.   The Freedom Of Information Act ................................4

    B.   The Bureau's Procurement Of Pentobarbital ........................6

    C.   CREW's FOIA Requests And This Action..........................9

SUMMARY OF ARGUMENT ..............................................13

STANDARD OF REVIEW ..................................................14

ARGUMENT ...................................................................15

I.   THE IDENTITIES OF THE BUREAU'S PENTOBARBITAL CONTRACTORS ARE NOT PROTECTED BY EXEMPTION 4 BECAUSE THEY ARE NOT "COMMERCIAL" INFORMATION ...............................................................15

    A.   Exemption 4's Application To "Commercial … Information" Depends On The Nature Or Function Of The Information, Not The Consequences Of Its Disclosure..........................................16

        1.   The Statutory Text Requires "Commercial … Information" Under Exemption 4 To Itself Be Commercial ..........................17

        2.   In Accordance With The Plain Text, Courts Determine Whether Information Is "Commercial" By Reference To The Nature Or Function Of The Information, Not The Consequences Of Its Disclosure..................................21

3.     Identifying Information Is Not "Commercial" When It Has No Commercial Function Or Commercial Nature .........................26

4.     The District Court Misread Precedent And Relied On Distinguishable District Court Case Law ..................................28

B.    Reputation-Based Harms Caused By Disclosure Are Irrelevant To Whether Information Is "Commercial"...............................................34

1.     This Court Has Previously Rejected Consideration Of Reputation-Based Harms In The Exemption 4 Context ..........34

2.     Consideration Of Reputation-Based Harms In Exemption 4 Subverts FOIA's Transparency Purpose...................................39

3.     Rejecting Reputation-Based Harms Aligns With FOIA's Requirement Across Exemptions That An Agency Cannot Rely Upon An Attenuated Chain Of Causation ...............................41

4.     Exemption 4 Does Not Involve Consideration Of The Impact Of Contractors' Reputational Injury On The Government's Interests ......................................................................................43

II.    THE GOVERNMENT FAILS TO SHOW THAT KEY CONTRACT TERMS THAT DO NOT IDENTIFY PENTOBARBITAL CONTRACTORS ARE "CONFIDENTIAL" AND THEREFORE PROTECTED UNDER EXEMPTION 4 ............................................45

A.    The District Court Overlooked That The Bureau's Confidentiality Claims Hinged On The Contract Terms Being Identifying ...............46

B.    The Bureau Failed To Substantiate That The Withheld Contract Terms Are Identifying ........................................................................50

CONCLUSION .......................................................................................54

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

## CASES

Page(s)

*100Reporters LLC v. United States Department of Justice*,
248 F. Supp. 3d 115 (D.D.C. 2017)..................................................................26

*ACLU v. United States Department of Justice*,
655 F.3d 1 (D.C. Cir. 2011)..........................................................................15

*Acumenics Research & Technology v. United States Department of
Justice*, 843 F.2d 800 (4th Cir. 1988).............................................................53

*American Airlines, Inc. v. National Mediation Board*,
588 F.2d 863 (2d Cir. 1978) ...................................................................18, 21

*Arieff v. United States Department of Navy*,
712 F.2d 1462 (D.C. Cir. 1983)................................................................19, 41

*Associated Press v. United States Department of Defense*,
554 F.3d 274 (2d Cir. 2009) .......................................................................41

*\*Baker & Hostetler LLP v. United States Department of Commerce*,
473 F.3d 312 (D.C. Cir. 2006) .........................................................24, 28, 29

*Burka v. United States Department of Health & Human Services*,
87 F.3d 508 (D.C. Cir. 1996)...........................................................................5

*\*Campbell v. United States Department of Justice*,
164 F.3d 20 (D.C. Cir. 1998).............................................5, 41, 51, 52, 53, 54

*Center for Auto Safety v. National Highway Traffic Safety
Administration*, 244 F.3d 144 (D.C. Cir. 2001) ............................................14

*Central Bank of Denver v. First Interstate Bank, N.A.*,
511 U.S. 164 (1994) .....................................................................................20

---

[*]     Authorities upon which we chiefly rely are marked with asterisks.

*CNA Financial Corp. v. Donovan*,
    830 F.2d 1132 (D.C. Cir. 1987)....................................................36

*Coastal States Gas Corp. v. United States Department of Energy*,
    617 F.2d 854 (D.C. Cir. 1980).....................................................51

*Comptel v. FCC*, 910 F. Supp. 2d 100 (D.D.C. 2012)............................................27

*Copper Plumbing & Heating Co. v. Campbell*,
    290 F.2d 368 (D.C. Cir. 1961).....................................................40

*Council for Urological Interests v. Burwell*,
    790 F.3d 212 (D.C. Cir. 2015) ....................................................20

*Critical Mass Energy Project v. Nuclear Regulatory Commission*,
    830 F.2d 278 (D.C. Cir. 1987)........................................28, 29, 30

*Department of Air Force v. Rose*, 425 U.S. 352 (1976) .......................................4, 5

*Electronic Privacy Information Center v. United States Department of
    Homeland Security*, 117 F. Supp. 3d 46 (D.D.C. 2015)........................32, 33

*FCC v. AT&T Inc.*, 562 U.S. 397 (2011) ................................................................18

*\*Food Marketing Institute v. Argus Leader Media*,
    139 S. Ct. 2356 (2019)........................................17, 18, 35, 38, 45

*Founding Church of Scientology of Washington, D.C., Inc. v. National
    Security Agency*, 610 F.2d 824 (D.C. Cir. 1979)..........................................36

*Getman v. NLRB*, 450 F.2d 670 (D.C. Cir. 1971) ..........................................26, 27

*In re Orion Pictures Corp.*, 21 F.3d 24 (2d Cir. 1994)............................................25

*Jordan v. United States Department of Justice*,
    668 F.3d 1188 (10th Cir. 2011) ...................................................39

*Judicial Watch, Inc. v. FDA*, 449 F.3d 141 (D.C. Cir. 2006)............................30, 31

*Judicial Watch, Inc. v. United States Department of Health & Human
    Services*, 525 F. Supp. 3d 90 (D.D.C. 2021) ................................................27

*Larson v. Department of State*, 565 F.3d 857 (D.C. Cir. 2009) ..............................51

*Mapother v. Department of Justice,*
    3 F.3d 1533 (D.C. Cir. 1993) ........................................................42

*McDonnell Douglas Corp. v. United States Department of Air Force*,
    375 F.3d 1182 (D.C. Cir. 2002).....................................................53

*Milner v. Department of Navy*, 562 U.S. 562 (2011) ...................5, 17, 38

*Multi Ag Media LLC v. Department of Agriculture*,
    515 F.3d 1224 (D.C. Cir. 2008)......................................................40

*\*National Association of Home Builders v. Norton*,
    309 F.3d 26 (D.C. Cir. 2002)................................. 17, 19, 21, 25, 26, 34, 50

*National Business Aviation Ass'n, Inc. v. FAA*,
    686 F. Supp. 2d 80 (D.D.C. 2010)..........................................23, 24

*National Parks & Conservation Association v. Morton*,
    498 F.2d 765 (D.C. Cir. 1974)........................................................35

*Norwood v. FAA*, 993 F.2d 570 (6th Cir. 1993) ....................................42

*Occidental Petroleum Corp. v. SEC*, 873 F.2d 325 (D.C. Cir. 1989) ....................36

*Pavement Coatings Technology Council v. United States Geological*
    *Survey*, 995 F.3d 1014 (D.C. Cir. 2021).........................................36

*Petroleum Information Corp. v. United States Department of Interior*,
    976 F.2d 1429 (D.C. Cir. 1992)......................................................15

*\*Public Citizen Health Research Group v. FDA*,
    704 F.2d 1280 (D.C. Cir. 1983)................................. 6, 18, 19, 21, 22, 30, 36

*Public Citizen v. United States Department of Health & Human*
    *Services*, 975 F. Supp. 2d 81 (D.D.C. 2013) ............................22, 37

*Public Employees for Environment Response v. Office of Science &*
    *Technology Policy*, 881 F. Supp. 2d 8 (D.D.C. 2012)....................26

*Public Employees for Environment Response v. United States Section,*
    *International Boundary & Water Commission, U.S.-Mexico*,
    740 F.3d 195 (D.C. Cir. 2014)........................................................39

*Russello v. United States*, 464 U.S. 16 (1983)......................................20

*Schwaner v. Department of Air Force*,
    898 F.2d 793 (D.C. Cir. 1990) ....................................................42

*Soghoian v. Office of Management & Budget*,
    932 F. Supp. 2d 167 (D.D.C. 2013)............................................26

*United States Department of Justice v. Tax Analysts*,
    492 U.S. 136 (1989)....................................................................54

*United States Department of State v. Ray*,
    502 U.S. 164 (1991)........................................1, 4, 5, 13, 34, 39

*\*United Technologies Corp. v. United States Department of Defense*,
    601 F.3d 557 (D.C. Cir. 2010)........................................35, 36, 37

*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973)....................................11

*\*Washington Research Project, Inc. v. Department of Health,
    Education, and Welfare,* 504 F.2d 238 (D.C. Cir. 1974) ......................22, 23

*Weyerhaeuser Co. v. United States Fish & Wildlife Service*,
    139 S. Ct. 361 (2018)..................................................................17

*William F. Wilke, Inc. v. United States Department of Army*,
    485 F.2d 180 (4th Cir. 1973) ......................................................40

*WP Co. v. United States Small Business Adminstration*,
    502 F. Supp. 3d 1 (D.D.C. 2020)................................................53

## STATUTES AND RULES

*5 U.S.C. § 552............................................... 1, 3, 4, 5, 13, 17, 19, 43, 44

11 U.S.C. § 107.......................................................................................25

28 U.S.C.
    § 1291 ...................................................................................3
    § 1331 ...................................................................................3

Pub. L. No. 86-36, 73 Stat. 63 (1959)....................................................36

Pub. L. No. 93-502, 88 Stat. 1561 (1974) .............................................19

Ark. Code Ann. § 5-4-617 .....................................................................40

Miss. Code. Ann. § 99-19-51 ....................................................40

Tex. Crim. Proc. Code Ann. Art. 43.14 ....................................40

Fed. R. App. P. 4 ......................................................................3

## REGULATIONS AND LEGISLATIVE MATERIALS

28 C.F.R. § 26.3 ........................................................................9

H.R. Rep. No. 89-1497 (1966)..................................................20

S. Rep. No. 89-813 (1965) ........................................................20

## OTHER AUTHORITIES

Allen, Jonathan, *Special Report: How the Trump Administration
    Secured a Secret Supply of Execution Drug*, Reuters
    (July 10, 2020), https://www.reuters.com/article/us-usa-
    executions-specialreport/special-report-how-the-trump-
    administration-secured-a-secret-supply-of-execution-drugs-
    idUSKBN24B1E4..............................................................6, 8

Bates, Josiah, *Why the Justice Department's Plan to Use a Single
    Drug for Lethal Injection Is Controversial*, Time
    (July 29, 2019), https://time.com/5636513/pentobarbital-
    executions-justice-department/ ..........................................8

Black's Law Dictionary (rev. 4th ed. 1968) ............................18

Death Penalty Information Center, *Behind the Curtain: Secrecy and
    the Death Penalty in the United States* (2018),
    https://documents.deathpenaltyinfo.org/pdf/SecrecyReport-
    2.f1560295685.pdf..............................................................8

Federal Bureau of Prisons, *Capital Punishment*,
    https://www.bop.gov/about/history/federal_executions.jsp (last
    visited Mar. 22, 2022)........................................................8

Federal Bureau of Prisons, *Solicitations & Awards*,
    https://www.bop.gov/business/solicitations.jsp
    (last visited Mar. 22, 2022)................................................8

McDaniel, Chris, *Inmates Said the Drug Burned as They Died. This Is How Texas Gets Its Execution Drugs*, Buzzfeed News (Nov. 28, 2018), https://www.buzzfeednews.com/article/ chrismcdaniel/inmates-said-the-drug-burned-as-they-died-this- is-how-texas?utm_source=dynamic&utm_campaign =bfsharecopy ................................................................................. 7

McDaniel, Chris, *Pharmacy That Mixed Executions Drugs Is Being Sold After Admitting Numerous Violations,* BuzzFeed News (Apr. 21, 2016), https://www.buzzfeednews.com/article/ chrismcdaniel/pharmacy-that-mixed-execution-drugs-is-being- sold-after-disc ............................................................................... 7

Neilson, Susie, *Lethal Injection Drugs' Efficacy and Availability for Federal Executions*, NPR (July 26, 2019), https://www.npr.org/2019/07/26/745722219/lethal-injection- drugs-efficacy-and-availability-for-federal-executions .................................. 6

SAM.gov Homepage, https://sam.gov/content/home (last visited Mar. 22, 2022) ........................................................... 8

United States Department of Justice, Press Release No. 21-623, *Attorney General Merrick B. Garland Imposes a Moratorium on Federal Executions; Orders Review of Policies and Procedures* (July 1, 2021), https://www.justice.gov/opa/pr/ attorney-general-merrick-b-garland-imposes-moratorium- federal-executions-orders-review ............................................... 9

Webster's Third New International Dictionary (1961) .......................................... 18

# GLOSSARY

| | |
|---|---|
| BOP / Bureau | Federal Bureau of Prisons |
| CREW | Citizens for Responsibility and Ethics in Washington |
| Department | United States Department of Justice |
| FDA | Food and Drug Administration |
| FOIA | Freedom of Information Act |
| JA | Joint Appendix |

# INTRODUCTION

The Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, gives the public a right to know "what [its] government is up to," including how the government spends taxpayer dollars. *U.S. Dep't of State v. Ray*, 502 U.S. 164, 177 (1991) (quotations omitted). Under FOIA, plaintiff-appellant Citizens for Responsibility and Ethics in Washington ("CREW") sought records from the Federal Bureau of Prisons ("Bureau") concerning the agency's procurement of pentobarbital for use in federal executions, including solicitations and contract awards.[1] The Bureau's response withheld information of substantial public interest. In particular, the Bureau refused to disclose the identities of its pentobarbital contractors and the key terms of its pentobarbital contracts, relying, as relevant here, on FOIA Exemption 4, which permits nondisclosure of matters that are "commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4).

Exemption 4 does not shield this information. The first category of information withheld—the identities of the Bureau's pentobarbital contractors—is not "commercial." The ordinary meaning of "commercial … information" encompasses only information that is valuable from a business perspective in and

---

[1]    CREW's FOIA request referred to pentobarbital, pentobarbital sodium, and Nembutal, which this brief describes collectively as "pentobarbital."

of itself.  Information is not commercial merely because its disclosure might result in some downstream business consequence.  Here, the Bureau has not shown (or even attempted to show) that a contractor's identity has any business value in and of itself.  It has pointed only to possible downstream effects, arguing that public disclosure could subject pentobarbital contractors to negative publicity, which might, in turn, lead to some financial loss.  That is not a proper ground for withholding information under Exemption 4.

The Bureau likewise failed to demonstrate that the second category of information withheld—key terms of its pentobarbital contracts—is "confidential" under Exemption 4.  The agency sought to label these terms as "confidential" solely on the theory that the terms could be used to publicly identify the contractors and that contractors wished to keep identifying information private.  It repeatedly emphasized that it was withholding "any information that could lead to the identity" of its contractors, including the contract terms at issue, because the contractors typically keep such identifying information private, have designated this identifying information as confidential, and have required or requested the Bureau maintain this identifying information as confidential.  But the Bureau never substantiated the premise of this theory—that the withheld contract terms could actually be used to identify its pentobarbital contractors.  The district court glossed over this omission, crediting the Bureau's general representations about

confidentiality without requiring it to establish the key fact on which each representation rested.

Expansive readings of Exemption 4 like those advanced by the Bureau and accepted by the district court undermine FOIA's core purpose. Instead of fostering transparency, such overbroad interpretations license the government and its contractors to hide how taxpayer dollars are being used and potentially abused. Here, that would mean blocking the public from learning whether the Bureau sourced its lethal injection drugs from reputable suppliers, so as to diminish the risk of botched executions, or whether the Bureau spent taxpayer funds reasonably. And across Exemption 4 cases, this expansive interpretation would transform strong public interest in information into a basis for *withholding* rather than disclosure. Such a result would turn FOIA's pro-transparency purpose on its head. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331. The court entered final judgment on September 30, 2021. JA409. Plaintiff-appellant filed a notice of appeal on November 29, 2021, JA428, within the time allowed by Federal Rule of Appellate Procedure 4(a)(1). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.    Whether the Federal Bureau of Prisons improperly withheld the identities of its pentobarbital contractors as "commercial" information under FOIA Exemption 4, even though the Bureau did not show that this information itself had any commercial value or function and instead focused solely on potential downstream consequences of disclosure.

2.    Whether the Federal Bureau of Prisons failed to satisfy its burden for withholding certain terms in its pentobarbital contracts as "confidential" information under Exemption 4, even though it did not substantiate its premise that the terms could be used to publicly identify the contractors and that contractors therefore keep them private.

## RELEVANT STATUTES AND REGULATIONS

This litigation involves the application of FOIA, 5 U.S.C. § 552.  Relevant subdivisions of the statute have been reproduced in the Addendum.

## STATEMENT OF THE CASE

### A.    The Freedom Of Information Act

FOIA "was enacted to facilitate public access to Government documents." *Ray*, 502 U.S. at 173.  The pro-transparency law "was designed 'to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'" *Id.* (quoting *Department of Air Force v. Rose*, 425 U.S. 352, 361

(1976)).  It provides that any federal agency, upon receiving a proper request for government records, "*shall* make the records promptly available to any person."  5 U.S.C. § 552(a)(3)(A) (emphasis added).  This language creates a "strong presumption in favor of disclosure."  *Ray*, 502 U.S. at 173.

FOIA accordingly "mandates that an agency disclose records on request, unless they fall within one of nine exemptions.  These exemptions are 'explicitly made exclusive,' and must be 'narrowly construed.'"  *Milner v. Department of Navy*, 562 U.S. 562, 565 (2011) (citations omitted).  As the Supreme Court has emphasized, FOIA's "limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act."  *Rose*, 425 U.S. at 361.

An agency seeking to withhold information bears the burden to justify nondisclosure under an exemption.  *Burka v. U.S. Dep't of Health & Human Servs.*, 87 F.3d 508, 514 (D.C. Cir. 1996).  In particular, the agency must justify its withholdings with "detailed and specific information demonstrating that material withheld is logically within the domain of the exemption claimed."  *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 30 (D.C. Cir. 1998) (quotations omitted).

This case involves Exemption 4.  Exemption 4 protects from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  An agency withholding non-

- 5 -

trade-secret information under Exemption 4 must show that the withheld

information is "(1) commercial or financial, (2) obtained from a person, and (3)

privileged or confidential." *Public Citizen Health Res. Grp. v. FDA*, 704 F.2d

1280, 1290 (D.C. Cir. 1983). At issue here are the first and third requirements.

### B. The Bureau's Procurement Of Pentobarbital

On July 25, 2019, the U.S. Department of Justice ("Department") announced

the resumption of federal executions after a nearly two-decade hiatus. JA157. The

Department also filed an addendum to the Bureau's execution protocol providing

for the use of pentobarbital as the lethal agent in federal executions (the "2019

Protocol"). JA7.

Questions immediately arose about how the government planned to acquire

its pentobarbital. One of the primary manufacturers of pentobarbital refuses to sell

the drug for use in executions. *See, e.g.*, Neilson, *Lethal Injection Drugs' Efficacy

and Availability for Federal Executions*, NPR (July 26, 2019) (cited at JA221).

While pentobarbital is available from compounding pharmacies, drugs produced

by such entities need not be approved by the Food and Drug Administration

("FDA") and are more prone to problems with potency or contamination that

"could lead to a needlessly painful death" for those executed by lethal injection.

Allen, *Special Report: How the Trump Administration Secured a Secret Supply of

Execution Drug*, Reuters (July 10, 2020) (cited at JA221); *see* JA8-9.

Botched state executions using pentobarbital from compounding pharmacies demonstrate the importance of properly sourcing and testing the drug. About a year before the adoption of the 2019 Protocol, botched executions in Texas raised questions about the source and quality of the pentobarbital that Texas had used. *See* McDaniel, *Inmates Said the Drug Burned As They Died. This Is How Texas Gets Its Execution Drugs*, Buzzfeed News (Nov. 28, 2018) (cited at JA9, 221). As the public later learned, one of Texas's suppliers was a compounding pharmacy that had been repeatedly cited by regulators for unsafe practices and was on probation with the Texas State Board of Pharmacy. *Id.*

The disclosure of Missouri's pentobarbital suppliers revealed similar issues. Federal and state regulators conducted inspections of a supplier in 2015, a year after its identity had been revealed. *See* McDaniel, *Pharmacy That Mixed Executions Drugs Is Being Sold After Admitting Numerous Violations*, BuzzFeed News (Apr. 21, 2016). Subsequent reporting revealed to the public that the FDA had determined the supplier, a compounding pharmacy, had "questionable potency, disinfecting and sterilization practices." *Id.* And it further revealed that state regulators had found a range of similarly improper practices—including that the pharmacists were arbitrarily extending expiration dates on drugs without proper testing or documentation. *Id.* The pharmacy ultimately admitted to 1,892 violations of state pharmacy guidelines. *Id.* Missouri then obtained pentobarbital

from a different compounding pharmacy.  When the identity of this new pharmacy

was revealed, the public learned that the FDA had found serious problems with the

pharmacy's practices and had labeled it "high risk."  Death Penalty Information

Center, *Behind the Curtain: Secrecy and the Death Penalty in the United States* 41

(2018) (quotations omitted).

Despite substantial public interest, the federal government has hidden the

identities of the companies that supply it pentobarbital and related critical services.

*See* Allen, *supra*, at p. 6; *see also, e.g.*, Bates, *Why the Justice Department's Plan*

*to Use a Single Drug for Lethal Injection Is Controversial*, Time (July 29, 2019)

(cited at JA221).  The government has also hidden key terms of its contracts,

including the date of the contracts and the per unit and total cost.  The federal

government ordinarily makes this type of information public.  Solicitations and

contracts with government agencies are generally posted to publicly available

databases.  *See*, *e.g.*, SAM.gov Homepage (last visited Mar. 22, 2022).  Indeed, the

Bureau directs vendors to these public websites for requests for information and

contract awards.  *See* Fed. Bureau of Prisons, *Solicitations & Awards* (last visited

Mar. 22, 2022).

The Bureau has used pentobarbital to execute 13 individuals since the

adoption of the 2019 Protocol.  *See* Fed. Bureau of Prisons, *Capital Punishment*,

(last visited Mar. 22, 2022).  On December 28, 2020, a new Department rule

authorized additional methods of execution other than lethal injection.  *See* 28

C.F.R. § 26.3(a).  Then, on July 1, 2021, the Department announced a moratorium

on federal executions.  *See* Press Release No. 21-623, U.S. Dep't of Just., *Attorney*

*General Merrick B. Garland Imposes a Moratorium on Federal Executions;*

*Orders Review of Policies and Procedures* (July 1, 2021).

## C.    CREW's FOIA Requests And This Action

CREW submitted FOIA requests to the Bureau and the Department seeking

records relating to the procurement of pentobarbital for use in federal executions.

CREW specifically requested:  "all records from February 14, 2019 to the present

related to the procurement of pentobarbital, pentobarbital sodium, or Nembutal to

be used in federal executions, including without limitation any notifications to or

communications with vendors, solicitation information, requests for information,

subcontracting leads, and contract awards."  JA284.

The Bureau initially determined that all responsive records were

categorically exempt from disclosure under multiple FOIA exemptions, JA150,

253, which CREW timely appealed, JA254.  The Bureau did not respond to the

appeal.  JA10, 278.

CREW filed suit on December 4, 2019. JA6.[2] The Bureau answered the complaint on January 15, 2020. JA14. Over the next several months, the Bureau withdrew its blanket reliance on FOIA's exemptions and produced certain responsive records. JA258-259, 261.

But the Bureau continued to withhold under Exemption 4 "any information that could lead to the identity" of its suppliers of pentobarbital or of those individuals or companies who "performed related critical services on that Pentobarbital supply." JA111 (¶ 48). The withheld information in this category swept broadly, including:

> names, titles, department titles, purchase order/reference numbers, account numbers, contract numbers, phone and fax numbers, web addresses, physical addresses, video conference ID numbers, IT information, as well as company logos, brochures, quotations, invoices, testing results, dates of purchase, service, and/or delivery, substance description, item/stock/UPC numbers, price, quantity, concentration, packaging details, expiration dates, container units, lot numbers, and product identification numbers.

JA111-112 (¶ 48).[3] The Bureau claimed that such information was "commercial" (thus fulfilling Exemption 4's requirement that information be "commercial or

_____

[2]    CREW also challenged the Department's failure to respond to the FOIA request directed to its Office of Information Policy. JA11-12. Over the course of the litigation, the Office of Information Policy produced responsive records to CREW. JA279. Its response is not at issue on appeal.

[3]    The Bureau also withheld under Exemption 4 additional information related to its procurement process, including "price and contract term negotiations, pricing and business strategies, instructions for ordering and purchase, unique order and

financial") and "confidential" (fulfilling Exemption 4's requirement that information be "privileged or confidential"). The Bureau also withheld information under other exemptions not relevant to this appeal, including Exemption 7.

The parties cross-moved for summary judgment. JA20, 210. In support of its motion, the Bureau submitted an index per *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973),[4] and declarations from Bureau information specialist Kara Christenson and Bureau attorney Rick Winter, *see* JA100, 159.

The district court granted and denied each party's motion for summary judgment in part. JA410. It granted summary judgment to CREW as to the Bureau's withholdings under Exemption 7.[5] And it granted summary judgment to the government as to the Exemption 4 withholdings of the identities of the pentobarbital contractors and the key terms of the pentobarbital contracts.

---

purchase requirements, and production and/or testing capability, to include formulas, quantity, timing of production and/or testing, and specific production/testing methods or standards." JA112 (¶ 49). These withholdings are not at issue on appeal.

[4] The government's original *Vaughn* index is at Dkt. 17-4, Exhibit F. The government later filed an updated *Vaughn* index removing exemptions and documents no longer in dispute. JA359-361. The updated index is available at JA364.

[5] The government did not appeal the district court's decision, and it provided the material previously withheld under Exemption 7 to CREW on December 3, 2021.

With respect to Exemption 4, the district court first accepted the government's argument that the identities of the Bureau's pentobarbital contractors are "commercial" information. The court did not identify any commercial value or function specific to the identities of the contractors. Rather, the court focused exclusively on downstream consequences of disclosure. According to the court, disclosure could cause contractors negative publicity and, in turn, "competitive harm" because it "could lead to harassment, cost them business, or force them to exit the pentobarbital market entirely." JA419.

The court then held that other key terms of the Bureau's pentobarbital contracts (besides the contractor's names) were "confidential," and protected from disclosure by Exemption 4. Although the Bureau's sole ground for arguing that these terms should be considered confidential was that they could be used to identify the Bureau's contractors, *see* JA112-115 (¶¶ 52-58), 165-169 (¶¶ 17-24), 314-315, the district court deemed irrelevant CREW's argument that the Bureau had failed to show that any of the withheld contract terms were actually identifying, JA421. Instead, the district court relied exclusively on the Bureau's broad "represent[ations] that the pentobarbital providers 'have typically kept' all of the withheld information 'private, have specifically designated the information as proprietary and/or confidential, and have expressly required or requested that the

Government maintain the information as confidential to the greatest extent possible under the law.'"  JA421 (quoting JA112 (¶ 51)).

CREW timely appealed.  JA428.

## SUMMARY OF ARGUMENT

The district court erred in granting summary judgment to the government. The Bureau failed to meet its burden to justify withholding under Exemption 4 either the identities of its pentobarbital contractors or the key terms of its pentobarbital contracts.

*First*, the identities of the Bureau's contractors are not "commercial … information."  To fall within Exemption 4, the withheld information must *in and of itself* be "commercial."  5 U.S.C. § 552(b)(4).  Whether disclosure of the information might result in commercial consequences is a separate question.  The district court held otherwise, relying upon the Bureau's concern that disclosure of the contractors' identities may lead to negative publicity that may, in turn, affect the contractors' financial fortunes.  Yet FOIA does not allow the Bureau to withhold information under Exemption 4 based on the potential consequences of disclosing contractors' voluntary dealings with the government.  Such an interpretation would turn FOIA on its head.  FOIA is specifically "designed to … open agency action to the light of public scrutiny."  *Ray*, 502 U.S. at 173 (quotations omitted).  Under the district court's reading of Exemption 4, however,

public interest in information would lead to its suppression rather than its disclosure.

*Second*, the Bureau has failed to show that the key terms of pentobarbital contracts, such as drug expiration dates, packaging details, and other similar information, are "confidential." The agency's sole argument for why this information is confidential was that pentobarbital contractors customarily keep *their identities* a secret, designate identifying information as confidential, and request that such identifying information be kept confidential. But the Bureau offered, at most, only speculation regarding how the withheld contract terms could be identifying. That was not enough. It is well established that the government bears the burden of providing a specific and detailed explanation for why withheld information satisfies each of the requirements for invoking a FOIA exemption.

In holding that the government met this burden, the district court ignored the critical fact that all of the Bureau's confidentiality representations applied to the withheld contract terms only insofar as the terms could actually be used to identify the Bureau's contractors. By not requiring the government to substantiate the premise underlying its confidentiality claim, the district court erred.

## STANDARD OF REVIEW

The Court reviews de novo the district court's grant of summary judgment. *Center for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 147

(D.C. Cir. 2001).  Summary judgment is proper only if there is no genuine dispute of material fact and if, viewing all facts and inferences in the light most favorable to CREW, the agency shows it is entitled to judgment as a matter of law. *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992).  "In the FOIA context this requires that [this Court] ascertain whether the agency has sustained its burden of demonstrating that the documents requested are … exempt from disclosure under the FOIA."  *ACLU v. U.S. Dep't of Just.*, 655 F.3d 1, 5 (D.C. Cir. 2011) (ellipsis in original and quotations omitted).

## ARGUMENT

### I. THE IDENTITIES OF THE BUREAU'S PENTOBARBITAL CONTRACTORS ARE NOT PROTECTED BY EXEMPTION 4 BECAUSE THEY ARE NOT "COMMERCIAL" INFORMATION

The question before this Court turns on the term "commercial … information" in Exemption 4.  The district court advanced an expansive understanding of the term focused on the consequences of disclosure rather than the nature or function of the information itself.  The court did not identify any commercial nature or function for the identities of the Bureau's pentobarbital contractors—nor could it, as the name of a contractor is simply a basic, descriptive fact about the existence of an enterprise.  Rather, the district court improperly concluded that pentobarbital contractors' identities were "commercial" based on (1) the potential downstream financial consequences of the information's

disclosure, and (2) the irrelevant reputation-based effects of disclosure.  Neither

suffices to make information "commercial" under Exemption 4.  The identities of

the Bureau's pentobarbital contractors have no intrinsic commercial value and

accordingly are not commercial information.

### A. Exemption 4's Application To "Commercial … Information" Depends On The Nature Or Function Of The Information, Not The Consequences Of Its Disclosure

The simplest flaw in the district court's reasoning is that Exemption 4

requires that "commercial" information *directly* be commercial, in and of itself.

Rather than considering whether the withheld information was intrinsically

commercial, the district court focused on the potential effects several steps

downstream from disclosure.  The court accepted that pentobarbital contractors

"face a serious risk to their commercial fortunes should the public become aware

that they supply the drug to the government," and then concluded this risk of

negative publicity constituted "competitive disadvantage."  JA418-419 (quotations

omitted).  In other words, under the district court's reasoning, the identity of a

pentobarbital contractor *becomes* commercial because disclosure might lead to a

negative public reaction, which in turn might cost the company business or lead the

company to make a voluntary decision to exit the pentobarbital market, which in

turn affects the company's bottom line.  Whether information is "commercial,"

however, does not depend on such a long and speculative chain of causation resulting from disclosure.  The information must itself be "commercial."

### 1. The Statutory Text Requires "Commercial … Information" Under Exemption 4 To Itself Be Commercial

FOIA does not define the term "commercial … information," so courts must give it its ordinary meaning.  *National Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002).  The Supreme Court has reiterated in recent years that FOIA must be interpreted according to its plain text.  *See Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) ("In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself."); *Milner*, 562 U.S. at 569.

Under the statute's plain text, the term "commercial" modifies "information."  5 U.S.C. § 552(b)(4) (covering "trade secrets and *commercial or financial information* obtained from a person and privileged or confidential" (emphasis added)).  As a result, the term plainly limits the type of information covered by the exemption:  The information *itself* must be "commercial."  *Cf. Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 368 (2018) ("Adjectives modify nouns—they pick out a subset of a category that possesses a certain quality.  It follows that 'critical habitat' is the subset of 'habitat' that is 'critical' to the conservation of an endangered species."); *see also Norton*, 309 F.3d at 38 (information is covered by Exemption 4 when it "'*in and of itself*' …

serves a 'commercial function' or is of a 'commercial nature'" (quoting *American Airlines, Inc. v. Nat'l Mediation Bd.*, 588 F.2d 863, 870 (2d Cir. 1978)) (emphasis added)).  As dictionary definitions from around the time of FOIA's passage in 1966 indicate, information is itself commercial if it is connected with the exchange of goods.  *See, e.g.*, Black's Law Dictionary 336-337 (rev. 4th ed. 1968) ("commercial" defined as "[r]elating to or connected with trade and traffic or commerce in general," and "commerce" defined as "[t]he exchange of goods"); Webster's Third New International Dictionary 456 (1961) (similar); *see also Argus Leader*, 139 S. Ct. at 2363 (citing the same two dictionaries in construing "confidential" in Exemption 4).

The other categories of information covered by Exemption 4 similarly lack any reference to the consequences of disclosure.  *See, e.g.*, *FCC v. AT&T Inc.*, 562 U.S. 397, 405 (2011) ("[W]hen interpreting a statute … we construe language … in light of the terms surrounding it." (ellipsis in original and quotations omitted)).  To fall within Exemption 4's protection of "trade secrets," courts examine whether the withheld information itself "*constitute[s]* trade secrets," defined as a "commercially valuable plan, … used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort."  *Public Citizen*, 704 F.2d at 1288 (emphasis added).  And the D.C. Circuit generally considers the terms "commercial or

financial" together by examining whether the information is "commercial … by its nature … []or in its function." *Norton*, 309 F.3d at 38-39 (quotations omitted); *see Public Citizen*, 704 F.2d at 1289 (as distinguished from narrower trade secret definition, "commercial or financial" information is "information used in a business which gives competitive advantage" (quotations omitted)). In other words, Exemption 4 applies when the withheld information itself meets the statutory requirement to be either "trade secrets" or "commercial or financial information," based on its nature or function.

The language of Exemption 4 contrasts with Exemption 6 and Exemption 7, which by their terms are tied to the consequences of disclosure. Exemption 6 exempts from disclosure "personnel and medical files and similar files the *disclosure of which* would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6) (emphasis added); *see also Arieff v. U.S. Dep't of Navy*, 712 F.2d 1462, 1468 (D.C. Cir. 1983) ("[I]t is the very production of the documents which must constitute a clearly unwarranted invasion of personal privacy." (quotations omitted)). Exemption 7 likewise allows agencies to withhold "records or information compiled for law enforcement purposes, but only to the extent that the *production of such law enforcement records or information*" has certain enumerated consequences. 5 U.S.C. § 552(b)(7) (emphasis added); *see* Pub. L. No. 93-502, 88 Stat. 1561, 1563 (1974) (amending Exemption 7 to add

consideration of disclosure consequences).  But Exemption 4, which Congress

adopted at the same time as Exemption 6 and shortly before the relevant

Exemption 7 text, lacks any similar language connecting its applicability to the

effects of disclosure.  "Where Congress includes particular language in one section

of a statute but omits it in another section of the same Act, it is generally presumed

that Congress acts intentionally and purposely in the disparate inclusion or

exclusion."  *Russello v. United States*, 464 U.S. 16, 23 (1983) (cleaned up); *see

also Council for Urological Interests v. Burwell*, 790 F.3d 212, 221 (D.C. Cir.

2015) (inclusion of language in one statutory exception and omission of the same

language in another "suggest[s] that the omission … was deliberate" (citing

*Central Bank of Denver v. First Interstate Bank, N.A.*, 511 U.S. 164, 176-177

(1994)).  The statutory context accordingly reinforces the plain text of Exemption

4:  It is the nature or function of the information itself that determines whether the

exemption applies, not the consequences of disclosure.

The statutory text reflects Congress's aim when enacting Exemption 4.  Both

the Senate and the House expressed concern for protecting intrinsically valuable

business information obtained from companies, such as "business sales statistics,

inventories, customer lists, and manufacturing processes."  S. Rep. No. 89-813, at

9 (1965); *see also* H.R. Rep. No. 89-1497, at 10 (1966) (similar).  Because of the

fundamental things they reveal about the business, each of these examples

represents information that is itself a trade secret or commercial or financial information.  *See Public Citizen*, 704 F.2d at 1286 (noting Congress intended Exemption 4 to cover each of the examples in the legislative history).  The legislative history for Exemption 4 provides no indication that Congress sought to protect information based solely on the downstream consequences of its disclosure.

2.   **In Accordance With The Plain Text, Courts Determine Whether Information Is "Commercial" By Reference To The Nature Or Function Of The Information, Not The Consequences Of Its Disclosure**

This Court has construed the term "commercial … information" in line with its plain text.  It has cautioned that "not every bit of information submitted to the government by a commercial entity qualifies for protection under Exemption 4." *Public Citizen*, 704 F.2d at 1290.  The Court has thus recognized that information is "commercial" under an ordinary meaning of the term if the information "'*in and of itself*' … serves a 'commercial function' or is of a 'commercial nature.'" *Norton*, 309 F.3d at 38 (emphasis added) (quoting *American Airlines*, 588 F.2d at 870).

In line with this ordinary meaning, courts have examined the nature or function of the information itself to determine whether it is commercial.  The most straightforward example is information that "reveal[s] basic commercial operations … or [that] relate to the income-producing aspects of a business," such as profits and losses and sales and inventory data.  *Public Citizen*, 704 F.2d at 1290; *see also,*

*e.g.*, *Public Citizen v. U.S. Dep't of Health & Hum. Servs.*, 975 F. Supp. 2d 81, 100 (D.D.C. 2013) (commercial information includes information such as general selling prices, purchase activity, freight charges, costs of goods sold, and manpower allocation).  Such information clearly has intrinsic commercial value separate from any consequences of disclosure.

The term "commercial … information" also reaches information in which the submitting company has "a commercial interest." *Public Citizen*, 704 F.2d at 1290.  But this is just another way of assessing the nature of the withheld information.  In *Public Citizen*, for example, this Court held that health and safety testing data, submitted by manufacturers of intraocular lenses to the FDA as part of required clinical trials, constituted "commercial" information.  *Id.*  To reach this conclusion, the Court did not examine whether disclosure would have commercial consequences for the companies.  *See id.*  The Court instead assessed the nature of the information and found that it was "instrumental" for the companies to "gain[] marketing approval for their products."  *Id.*

In *Washington Research Project, Inc. v. Department of Health, Education, and Welfare*, this Court followed the same approach to hold that a scientist's research designs were *not* commercial because the scientist did not have a "trade or commercial interest" in the information.  504 F.2d 238, 245 (D.C. Cir. 1974).  In that case, the scientist argued that premature disclosure of the research designs

could lead to "misappropriation" and deprive him "career advancement and attendant material rewards." *Id.* at 244. This Court rejected the scientist's focus on the consequences of disclosure. *Id.* at 244-245. The Court instead examined the nature of the withheld research designs, concluding that the scientist was not "engaged in trade or commerce" and the agency "did not introduce a single fact relating to the commercial character of any specific research project." *Id.* at 244 & n.6. Noting FOIA's "mandate to construe exemptions narrowly," the Court found that the designs were not "commercial." *Id.* at 245.

And the district court took the same approach in *National Business Aviation Ass'n, Inc. v. FAA*, 686 F. Supp. 2d 80, 87 (D.D.C. 2010). There, the court rejected an industry association's attempt to keep secret a list of blocked aircraft registration numbers under Exemption 4 based on a "prediction of the dire consequences of release." *Id.* "Despite the fact that the release of aircraft registration numbers would not provide the identity of the occupants of any aircraft," the industry association argued disclosure would "compromise the privacy and security of the blocked aircraft and their often high profile occupants." *Id.* "[C]ounter[ing]" these "consequences," the court explained, was the fact that the "[l]ist simply does not contain commercial information." *Id.* As it held: "The Aviation Association's speculation that the registration numbers might be used to obtain historical location information and that location information might be used

for insight into the nature of a company's business dealings does not convert the *aircraft registration numbers themselves* into commercial information." *Id.* (emphasis in original).

To the extent courts have analyzed the potential effect of disclosure, they have done so only as a heuristic to determine whether the information itself was commercial. In *Baker & Hostetler LLP v. United States Department of Commerce*, for example, this Court held that letters submitted by American lumber companies to the Department of Commerce contained "commercial information" that was properly withheld under Exemption 4. 473 F.3d 312, 320 (D.C. Cir. 2006). As in *Public Citizen*, the D.C. Circuit focused on the nature of the information: The letters described the domestic lumber industry's "commercial concerns"; the "commercial strengths and challenges fac[ing]" domestic companies; "favorable market conditions"; the "requirements for achieving a competitive … market"; and the status and business impact of negotiations on the United States-Canada lumber trade dispute. *Id.* at 319-320 (quotations omitted). This Court then also noted that "disclosure [of the letters] would help rivals to identify and exploit those companies' competitive weaknesses." *Id.* at 320. It did not, however, suggest that it was adopting a different test for "commercial" information; rather, it examined the consequences of disclosure because they shed light on the nature of the information itself. *See id.* at 319-320. In other words, that the letters described

competitive weaknesses a competitor could exploit indicated that the information itself revealed important information about the businesses.[6]

Similarly, in *National Association of Home Builders v. Norton*, this Court determined that owl-sighting data used for critical habitat designations was not commercial. The Court explained: "No 'business information' is involved, and the owl-sighting data itself is commercial neither by its nature (having been created by the government rather than in connection with a commercial enterprise) nor in its function (as there is no evidence that the parties who supplied the owl-sighting information have a commercial interest at stake in its disclosure)." *Norton*, 309 F.3d at 39 (citation omitted). The Court referenced the submitter's interest in disclosure in order to determine whether or not the information itself had a commercial function. *Id.* Indeed, *Norton* confirmed that "information is commercial under this exemption if, *in and of itself*, it serves a commercial

---

[6]     Courts have similarly focused on the nature of the information and have used competitive significance as a heuristic to evaluate whether information is "commercial" information in other contexts. *See In re Orion Pictures Corp.*, 21 F.3d 24, 27 (2d Cir. 1994) (defining "commercial information" for 11 U.S.C. § 107, concerning public's right of access to records in bankruptcy proceedings, "as information which would cause an unfair advantage to competitors by providing them information as to the commercial operations of the debtor" (quotations omitted)).

function or is of a commercial nature."  *Id.* at 38 (emphasis added and quotations omitted).[7]

### 3. Identifying Information Is Not "Commercial" When It Has No Commercial Function Or Commercial Nature

Courts have repeatedly rejected classifying identity information as commercial when, as here, nothing indicates that the information itself has any commercial function or commercial value.  In *Getman v. NLRB*, for example, the D.C. Circuit held that "a *bare* list of names and addresses of employees" eligible to vote in union representation elections was not "commercial" information.  450 F.2d 670, 673 (D.C. Cir. 1971) (emphasis added).  The Court's use of the word "bare" suggests that the list of names and addresses was just that—identity information that communicated nothing of business significance, served no obvious business function, and otherwise had no apparent business utility itself.

---

[7]     *See also, e.g.*, *100Reporters LLC v. U.S. Dep't of Just.*, 248 F. Supp. 3d 115, 137 (D.D.C. 2017) (provider had commercial interest in compliance and training materials because they were instrumental to operations); *Soghoian v. Office of Mgmt. & Budget*, 932 F. Supp. 2d 167, 174 (D.D.C. 2013) (providers had commercial interest in documents because they referred to "potential costs or allocations of risk associated with [a] proposed Copyright Alert Program," which would "surely … impact the[ir] commercial status and dealings"); *Public Emps. for Env't Resp. v. Off. of Sci. & Tech. Pol'y*, 881 F. Supp. 2d 8, 14 (D.D.C. 2012) ("There is no doubt that both BIO and its members have a commercial interest in BIO's advocacy strategy, which is at the core of BIO's competitive value to itself and its members.").

The Court noted without further analysis that the names "cannot be fairly characterized as … 'commercial' information." *Id.*

District courts in this Circuit have reached the same conclusion. In *Judicial Watch, Inc. v. United States Department of Health and Human Services*, for example, the district court concluded that the names and addresses of a company's contract laboratories were not "commercial." 525 F. Supp. 3d 90, 96-98, 98 n.5 (D.D.C. 2021). The agency in that case argued that disclosure of the contract laboratories "could reveal [the company's] sources for specialized services that could be an important aspect of [the company's] commercial operations." *Id.* at 96 (quotations omitted). Yet the court held that there was no evidence that the company had a "commercial interest" in the names and addresses of its contract laboratories. *Id.* at 97. It noted that "this type of information is not obviously commercial" and neither the agency nor the company had offered evidence to demonstrate why it would be commercial. *Id.* at 98; *see also, e.g.*, *Comptel v. FCC*, 910 F. Supp. 2d 100, 116 (D.D.C. 2012) (rejecting agency attempt to redact the names of company staff and contractors and explaining that "[w]hile the Court assumes corporations can have a commercial interest in the names of certain staff, it is not a certainty that a corporation would have a commercial interest in the names of every one of its employees").

### 4. The District Court Misread Precedent And Relied On Distinguishable District Court Case Law

The district court here came to a different conclusion about the identities of pentobarbital contractors by misunderstanding *Baker*, 473 F.3d 312, reading it to hold that information is commercial whenever the information "'could … materially affect[]' the 'commercial fortunes' of the business," JA417 (alterations and ellipsis in original). The district court then examined the potential downstream financial consequences that disclosure of their identities could have on the Bureau's pentobarbital contractors. Because it concluded that negative publicity would likely follow disclosure, which could then have financial consequences, the district court held that the identities were "commercial." But the district court quoted *Baker* out of context and misapprehended its core logic.

In the excerpt quoted by the district court, *Baker* was itself quoting an earlier case, *Critical Mass Energy Project v. Nuclear Regulatory Commission*, 830 F.2d 278 (D.C. Cir. 1987), *vacated on other grounds by* 975 F.2d 871 (D.C. Cir. 1992) (en banc). In the full quote, the *Baker* Court explained that *Critical Mass* had "stated that the 'commercial fortunes' of member utilities 'could be materially affected by the disclosure of *health and safety problems experienced during the operation of nuclear power facilities*.'" *Baker*, 473 F.3d at 319 (quoting *Critical Mass*, 830 F.2d at 281) (emphasis added). As the full quote illustrates, neither *Baker* nor *Critical Mass* indicated that information is "commercial" *whenever*

disclosure "could materially affect the commercial fortunes of the business." JA417 (cleaned up). Indeed, neither case stands for the proposition that the consequences of disclosure, rather than the nature of information, determine whether information is commercial.

As described above, *Baker* turned on the fact that the information in dispute *itself* had commercial value. 473 F.3d at 319-320. The letters at issue contained information regarding lumber market conditions, negotiation recommendations and information, and assessments of competitive and commercial strengths and weakness—information that "describe[d] favorable market conditions" for the submitting U.S. lumber companies. *Id.* at 320. *Baker*'s recognition that "disclosure [of the letters] would help rivals to identify and exploit those companies' competitive weaknesses" was part of its analysis of whether the companies had a "commercial interest" in the information. *Id*. (quotations omitted). The court did not rely on the consequences of disclosure as an independent test for determining whether the information at issue was commercial.

Similarly, the information at issue in *Critical Mass* revealed enterprise vulnerabilities by describing "the details of the operations of [the member organizations'] nuclear power plants," 830 F.2d at 281 (quotations omitted)— valuable information in and of itself that went to the heart of the facilities' ability to function and, as *Public Citizen* put it, revealed fundamental aspects of their

"commercial operations" and "relate[d] to the income-producing aspects of [their] business," 704 F.2d at 1290. While the *Critical Mass* court noted that the member utilities' commercial fortunes "could be materially affected by the disclosure," its conclusion was tied to its determination that the information itself revealed "health and safety problems" and "the operations of … nuclear power plants"—sensitive information relating directly to the utilities' commercial operations. 830 F.2d at 281 (quotations omitted). Indeed, *Critical Mass* found the withheld "health and safety problems" information "[c]omparabl[e]" to the health and safety data held to be "commercial" information in *Public Citizen*. *Id.* As described above, *Public Citizen* made its determination about commerciality based upon the direct business utility of the information. 704 F.2d at 1290. *Critical Mass* in no way suggested that it was deviating from *Public Citizen* by evaluating commerciality based on the consequences of disclosure, rather than the intrinsic business nature or function of the information.

The district court also selectively quoted *Judicial Watch, Inc. v. FDA*, suggesting that information is "commercial" when there is "competitive disadvantage to the submitting entity' that 'could result' from 'disclosure." JA419 (quoting *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 148 (D.C. Cir. 2006)). However, the language relied upon by the district court was this Court's description of the purpose behind Exemption 4—not a substantive standard for

determining commerciality. *Judicial Watch* explained that materials covered by Exemption 4 are generally received by the agency from a third party, and "[t]he agency thus has an incentive to be a good steward of [the] information [submitted]: Disclosure could result in competitive disadvantages to the submitting entity, discouraging them from giving quality information in the future." 419 F.3d at 148. The Court did not hold that information was "commercial" whenever there was the possibility of commercial consequences following disclosure.[8]

*Baker* and other precedent accordingly fail to support the district court's view that downstream consequences of disclosure can convert information that has no intrinsic commercial value into "commercial" information. Here, the Bureau made no showing here that the identities of its pentobarbital contractors have any innate commercial value or function. Rather, the agency focused—and the district court's decision was based—entirely on the potential consequences of disclosure.

---

[8]     The Court ultimately remanded to the district court due to deficiencies in the agency's *Vaughn* index. *Judicial Watch*, 449 F.3d at 150. In dicta, the Court examined affidavits provided by the agency and stated that they "provide[d] evidence, sufficient to satisfy the requirements of Exemption 4, of competitive harm in the medical abortion market that would result from the release of information." *Id.* It appears that the court was referring not to the "commercial" prong of Exemption 4, but to the "substantial competitive harm" requirement that used to be part of the "confidential" prong of Exemption 4. *See id.* at 148-150 (discussing *National Parks* standard for confidentiality). Separate from the substantial competitive harm analysis, the court determined that the affidavits contained "either trade secrets or commercial information that would be valuable to competitors." *Id.* at 150.

*See* JA419 ("The competitive harm here is quite clear—revelation of the companies' identity could lead to harassment, cost them business, or force them to exit the pentobarbital market entirely."). Because both precedent and the statutory text required the district court to examine the nature of the information and not the consequences of disclosure, the court erred in finding the identities of pentobarbital contractors were "commercial" information.

On these bases, the Court may also readily distinguish *Electronic Privacy Information Center ("EPIC") v. United States Department of Homeland Security*, 117 F. Supp. 3d 46 (D.D.C. 2015), the primary district court case that the district court here relied upon to support its holding that pentobarbital contractor identifying information is "commercial." JA417-418.

*EPIC* concerned the Exemption 4 withholding of the identities of defense industry participants in a government cyber-security pilot program. The district court in that case recognized that "a company may not always have a commercial interest in its name and identity" and it based its ruling on the "particular" "context in which the [identity] issue" arose. *EPIC*, 117 F. Supp. 3d at 62-63. It held that disclosure of the pilot program participants could have been seen as an admission by them of cyber vulnerability, opening them to "increased cyber targeting" and "competitive disadvantages or market loss." *Id.* at 64 (quotations omitted); *see id.* at 63. That context is far removed from this case. Participation in a government

pilot program that effectively reveals a company's cyber vulnerability is different from obtaining lucrative contracts to sell potentially unpopular products to the Bureau. Revealing a company's cyber vulnerability concerns the company's ability to carry out basic business functions, free from destabilizing attacks. But here, the disclosure of a company's identity as a supplier of pentobarbital or critical related services to the Bureau does not reveal a business vulnerability or other commercial function. Rather, the Bureau claimed only that identifying pentobarbital contractors may cause them negative publicity, which may have downstream financial effects. *EPIC* does not support finding information "commercial" based on such an attenuated connection to a company's business.

And insofar as *EPIC* can be understood to indicate information can be "commercial" based solely on the downstream consequences of disclosure, the case was wrongly decided.[9]

***

In sum, the identities of pentobarbital contractors have no commercial value and accordingly are not "commercial … information" under Exemption 4. In considering only the downstream consequences of disclosure, the district court

---

[9]     Even if *EPIC* potentially reached the wrong result under Exemption 4, the identity information it addressed could potentially be covered by other exemptions. *See EPIC*, 117 F. Supp. 3d at 66-67 (government could have withheld identities under Exemption 7(D)'s protection of "confidential source[s]" had it provided more than conclusory statements in its *Vaughn* index on this point).

ignored the controlling question from the exemption's plain text: whether the information at issue is commercial "in and of itself." *Norton*, 309 F.3d at 38 (quotations omitted).

### B. Reputation-Based Harms Caused By Disclosure Are Irrelevant To Whether Information Is "Commercial"

The district court separately erred in its analysis of "commercial … information" by basing its determination on the potential effects of negative publicity. Exemption 4 does not protect information simply because disclosure could lead to reputational harm, even if that reputational harm may indirectly affect an entity's business or competitive position. The purpose of FOIA is "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Ray*, 502 U.S. at 173 (quotations omitted). The district court's decision would invert that principle by permitting "public scrutiny" to be a basis for withholding, rather than for disclosure.

#### 1. This Court Has Previously Rejected Consideration Of Reputation-Based Harms In The Exemption 4 Context

Prior to the Supreme Court's decision in *Argus Leader*, this Court repeatedly held reputational harm does not trigger Exemption 4. This Court reached that conclusion based on its interpretation of another Exemption 4 term— "confidential," which this Court had interpreted as limited to information whose disclosure would lead to substantial competitive harm to the disclosing entity. *See*

*National Parks & Conservation Ass'n. v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974). Although the Supreme Court rejected this interpretation of "confidential"— holding that the plain meaning of the term requires that the information is "customarily kept private" by its owner, *Argus Leader*, 139 S. Ct. at 2363—the pre-*Argus Leader* case law continues to provide useful guidance on the type of information that triggers Exemption 4. Those cases repeatedly held that negative publicity and reputational injury are insufficient to bring information within the ambit of Exemption 4.

In *United Technologies Corp. v. United States Department of Defense*, for instance, defense contractors argued that Exemption 4 shielded as "confidential" information that they claimed would be exploited by "competitors … to discredit them in the eyes of current and potential customers," and cause "negative publicity" and "their reputation [to] suffer as a result." 601 F.3d 557, 563 (D.C. Cir. 2010). The D.C. Circuit rejected this argument. It explained that "Exemption 4 does not guard against mere embarrassment in the marketplace or reputational injury." *Id.* at 564.

The Court reached this conclusion by relying on three prior cases. First, this Court noted that *CNA Financial Corp. v. Donovan* had previously recognized that "[c]alling customers' attention to unfavorable agency evaluations or unfavorable press does not amount to an 'affirmative use of proprietary information by

competitors.'" *United Techs.*, 601 F.3d at 563-564 (quoting *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1154 (D.C. Cir. 1987)).  Second, it quoted the analysis in *Public Citizen* that "'injury to competitive position, as might flow … from the embarrassing publicity attendant upon public revelations' is not substantial competitive harm." *Id.* at 564 (ellipsis in original) (quoting *Public Citizen*, 704 F.2d at 1291 n.30).  And third, it cited to the analysis in *Occidental Petroleum Corp. v. SEC* that "desire to avoid embarrassment and reputational damage is irrelevant to substantial competitive harm determination."  *Id.* (citing *Occidental Petroleum v. SEC*, 873 F.2d 325, 341 (D.C. Cir. 1989)).[10]

While *Argus Leader* rejected the use of the substantial competitive harm test to evaluate confidentiality under Exemption 4, the same principles fit naturally with evaluating whether information is "commercial."  In considering what types of "confidential" business interests properly fall within Exemption 4, the pre-*Argus Leader* cases carried out precisely the type of inquiry that the ordinary meaning of

---

[10]     The D.C. Circuit has reached a similar conclusion in other FOIA contexts. *See Pavement Coatings Tech. Council v. U.S. Geological Surv.*, 995 F.3d 1014, 1022 (D.C. Cir. 2021) (explaining with respect to Exemption 5 that "criticism is not a recognized harm against which the deliberative process privilege is intended to protect"); *Founding Church of Scientology of Washington, D.C., Inc. v. National Sec. Agency*, 610 F.2d 824, 829 n.49 (D.C. Cir. 1979) (stating with respect to the disclosure of information under Exemption 3 and, in turn Pub. L. No. 86-36, 73 Stat. 63 (1959), that "every effort should be made to segregate for ultimate disclosure aspects of the records that would not implicate legitimate intelligence operations, however embarrassing to the agency").

the term "commercial" requires:  considering the nature of the information at issue and whether it has commercial value.  *See supra* pp. 16-26.  They therefore remain persuasive in establishing that information does not have commercial value simply because it may lead to embarrassment or reputational injury.

The district court's decision in *Public Citizen* exemplifies the pre-*Argus Leader* case law's continued relevance.  *See* 975 F. Supp. 2d at 107.  There, the district court relied on the pre-*Argus Leader* cases to hold that the identity of an agency investigating certain pharmaceutical companies and the status of these investigations was not "commercial."  The court first noted that the identity "would not, standing alone, reveal any information about the business operations or other commercial activities."  *Id.*  The court then held that reputational injury arising from disclosure did not alter the analysis:  It noted that even if this information "may be embarrassing or harmful to the reputation of a company," "the law is well-settled that this potential consequence of a disclosure *does not convert the information into 'commercial' under Exemption 4*."  *Id.* (emphasis added). Quoting *United Technologies*, the court emphasized Exemption 4 does not guard against "mere embarrassment … or reputational injury."  *Id.* (quoting *United Techs.*, 601 F.3d at 564).

Although the majority in *Argus Leader* addressed only Exemption 4's "confidentiality" requirement, the dissent emphasized that reputational concerns

cannot alone satisfy Exemption 4's "commercial" prong. As the dissent explained, Exemption 4's "focus on 'commercial' or 'financial' information … implies that the harm caused by disclosure must do more than, say, simply embarrass the information's owner. It must cause some genuine harm to an owner's economic or business interests." 139 S. Ct. at 2368 (Breyer, J., dissenting). Nothing in *Argus Leader* forecloses this approach. Although the Court rejected the "substantial competitive harm" framework for Exemption 4's confidential prong, *id.* at 2364-2366 (majority opinion), the Court did not discuss whether similar limits apply to the exemption's commercial prong.

This Court recently took a similar approach in another FOIA exemption context. In *Milner*, the Supreme Court overturned decades-old precedent from this Court that had held Exemption 2's protection of records "related solely to the internal personnel rules and practices of an agency" permitted agencies to withhold critical infrastructure records when disclosure would risk circumvention of law. 562 U.S. at 564-565, 573-577. In a concurrence, Justice Alito emphasized that certain records no longer exempt under Exemption 2 could likely still be withheld under Exemption 7. *Id.* at 582 (Alito, J., concurring). He noted that Exemption 7 "may have been overshadowed in recent years by the broad reach" of the prior interpretation of Exemption 2. *Id.* This Court subsequently agreed. It held that critical infrastructure records could be withheld under Exemption 7(E), which

expressly protects certain records when, as the prior Exemption 2 case law specified, disclosure would "risk circumvention of the law." *See Public Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 198-199 (D.C. Cir. 2014); *see also id.* at 202-205; *Jordan v. U.S. Dep't of Just.*, 668 F.3d 1188, 1200 (10th Cir. 2011) (holding post-*Milner* that the government had not waived an argument under Exemption 7(E), even though it had only raised Exemption 2 in the district court, because "Exemption 7E is essentially the same as [Exemption 2 pre-*Milner*], with the added requirement that material be 'compiled for law enforcement purposes'").

### 2. Consideration Of Reputation-Based Harms In Exemption 4 Subverts FOIA's Transparency Purpose

FOIA is specifically designed to "open agency action to the light of public scrutiny." *Ray*, 502 U.S. at 173 (quotations omitted). As a result, FOIA requests may certainly subject the federal government and its contractors to criticism, and, in turn, reputational consequences. Yet the district court's consideration of reputational harms turns FOIA's pro-transparency purpose upside down: It permits "public scrutiny" to be a basis for *withholding* rather than disclosure.

Under the court's analysis, any contractor could claim that it had a commercial interest in keeping its identity secret because it feared unquantified reputational injury that could then lead to financial loss. For example, a company that supplies food to public elementary schools could decide that it wants to keep

secret its identity as a supplier of food for inmates because it fears that it would receive negative publicity for providing food to the Bureau.  Or a hospital system that provides medical services to the general public could decide that it wants to keep secret its identity as a provider of medical services to inmates for similar reasons.

The term "commercial" cannot support such a boundless reading.  Such an interpretation would subvert FOIA's goal of enabling the public to "monitor whether the [Bureau] is carrying out its statutory duty."  *Multi Ag Media LLC v. Department of Agric.*, 515 F.3d 1224, 1232 (D.C. Cir. 2008).

Transparency principles embedded in federal procurement law reinforce the public interest served by this information.  Consistent with FOIA's transparency goal, procurement law typically presumes that the public should know who is contracting with the government.  *See supra* p. 8.  Federal procurement law does not give a private party a right to contract with the government, let alone do it in secret.  *See*, *e.g.*, *Copper Plumbing & Heating Co. v. Campbell*, 290 F.2d 368, 370-371 (D.C. Cir. 1961); *William F. Wilke, Inc. v. Department of Army of U.S.*, 485 F.2d 180, 183 (4th Cir. 1973).  Congress could, like many states, specifically order the identities of entities that participate in the lethal injection process be kept confidential.  *See* Ark. Code Ann. § 5-4-617(h)(i)(1)(B); Miss. Code. Ann. § 99-19-51(6)(c); Tex. Crim. Proc. Code Ann. Art. 43.14(b)(2).  Yet it has not done so.

Under these circumstances, the Court should be especially wary of reading the term "commercial" information to bar disclosure of pentobarbital contractors' identities based on reputational fears.

### 3. Rejecting Reputation-Based Harms Aligns With FOIA's Requirement Across Exemptions That An Agency Cannot Rely Upon An Attenuated Chain Of Causation

Across FOIA exemptions, courts require more of a direct connection to FOIA's requirements than the attenuated chain of causation accepted by the district court here.  The agency seeking to justify withholding must show "why the documents fall within the exemption," with more than generalized or speculative allegations.  *See, e.g.*, *Campbell*, 164 F.3d at 30.

Consider, for example, Exemption 6.  As discussed, Exemption 6 protects certain files based on the consequences of their disclosure:  whether they will result in unwarranted invasions of privacy if released.  See *supra* p. 19.  But the government may withhold files under the exemption only if the information will *itself* identify individuals or otherwise invade their privacy if disclosed; the exemption is not concerned with disclosures that could result in invasions of privacy "*as a secondary effect*."  *Arieff*, 712 F.2d at 1468 (emphasis in original); *see also Associated Press v. U.S. Dep't of Def.*, 554 F.3d 274, 292 (2d Cir. 2009) ("[T]he focus … under Exemption 6[] must be solely upon what the requested information *reveals*, not upon what it might lead to." (emphasis in original and

quotations omitted)); *Norwood v. FAA.*, 993 F.2d 570, 574-575 (6th Cir. 1993) (similar).

Courts have similarly required a direct connection in applying Exemption 2, *see Schwaner v. Department of Air Force*, 898 F.2d 793, 798 (D.C. Cir. 1990) (Air Force roster of names and duty addresses did not fall under Exemption 2 because "the link to duty assignment rules and practices … [was] tenuous and indirect"), and Exemption 5, *see Mapother v. Department of Just.*, 3 F.3d 1533, 1540 (D.C. Cir. 1993) (biographical chronology section in government report did not warrant withholding under Exemption 5 because it was "simply too attenuated" from the government's deliberative process).

It follows logically from these cases that an agency cannot rely on an extended chain of disclosure consequences to withhold information under Exemption 4. (Of course, a plain reading of the term "commercial … information" compels the same conclusion, and in fact bars consideration of the consequences of disclosure altogether. *See supra* pp. 16-26.) Yet according to the district court, a causal chain that begins with negative publicity and depends on the independent actions of third parties—individual and enterprise customers—for any financial impact to pentobarbital contractors suffices to transform otherwise noncommercial identifying information into commercial information. That cannot be.

#### 4. Exemption 4 Does Not Involve Consideration Of The Impact Of Contractors' Reputational Injury On The Government's Interests

Nor can the Bureau invoke Exemption 4 based on the *agency*'s concern for maintaining its supply of lethal injection drugs. The Bureau emphasized such concerns in the declarations it submitted in support of its motion for summary judgment. *See* JA169 (¶ 23) (disclosure of contractors' identities "will cause them to cease their participation in the Bureau's lethal injection protocol"); *see also* JA165-168 (¶¶ 17, 19-20) (discussing how the negative publicity and related consequences faced by publicly disclosed contractors causes them to refuse to supply lethal injection drugs to the government), 114-115 (¶¶ 56-57) (similar). Such concerns may be properly evaluated under other exemptions, but not Exemption 4.

For example, the Bureau initially argued in the district court that the identities of pentobarbital contractors fell under Exemption 7(A), which protects "records or information compiled for law enforcement purposes" when disclosure "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). According to the Bureau, the disclosure of the contractors' identities would interfere with enforcement proceedings, JA131-132 (¶¶ 109-111), by enabling "harassment and pressure" that would in turn cause them to "refuse to engage in business with the federal government" for lethal injection purposes and

therefore interfere with the Bureau's ability to carry out capital sentences, JA136 (¶ 119); *see* JA132-133, 135-137 (¶¶ 112-113, 118-121); *see also* JA55-59. But the Bureau has abandoned reliance on Exemption 7(A), JA356, 414, and now asserts no law enforcement justification under Exemption 7 for maintaining the secrecy of its pentobarbital contractors' identities.

These same justifications have no relevance in Exemption 4. Unlike Exemption 7(A), Exemption 4's text does not incorporate consideration of the *government's* interests. Exemption 4 protects "trade secrets and commercial or financial information obtained from a person and privileged or confidential"; it therefore mandates consideration of whether the information is itself a trade secret or commercial or financial. By contrast, Exemption 7(A) specifically incorporates consideration of government interests: Information is protected under this exemption only if "production" of the information "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). By withdrawing its claim under Exemption 7(A), the Bureau abandoned its claim that disclosure of its contractors' identity would compromise any of its enforcement proceedings.

In short, whether or not the Bureau's interest in maintaining its supply of pentobarbital could justify withholding under some other exemption, that interest is

irrelevant to the question whether identifying information is itself commercial for purposes of Exemption 4.

## II. THE GOVERNMENT FAILS TO SHOW THAT KEY CONTRACT TERMS THAT DO NOT IDENTIFY PENTOBARBITAL CONTRACTORS ARE "CONFIDENTIAL" AND THEREFORE PROTECTED UNDER EXEMPTION 4

The Bureau has withheld as "confidential" under Exemption 4 certain key contract terms in its pentobarbital contracts: drug price, quantity, expiration dates, invoices, container units, lot numbers, purchase order/reference numbers, substance description, concentration, packaging details, and dates of purchase, service, and/or delivery. *See* JA111-112 (¶ 48). The Bureau claimed that this information could be used to identify its pentobarbital contractors. *See* JA314-315.

Under *Argus Leader*, the key question in assessing whether this contract information is "confidential" is whether it is "customarily kept private." 139 S. Ct. at 2363.[11] The district court erred in holding that the Bureau had carried its burden of showing the information is customarily kept private, as (1) the court overlooked that the Bureau had predicated its confidentiality argument on the contract terms having identifying power and (2) the Bureau did not demonstrate that the contract terms are identifying.

---

[11]     *Argus Leader* left open whether "information might be considered confidential only if the party receiving it provides some assurance that it will remain secret." 139 S. Ct. at 2363. This question is not at issue on appeal.

## A. The District Court Overlooked That The Bureau's Confidentiality Claims Hinged On The Contract Terms Being Identifying

The district court held that it was irrelevant "whether any given piece of information could identify the companies." JA421. It held that all that mattered was the Bureau's general representations regarding the confidentiality of information withheld under Exemption 4. In particular, the court found dispositive a single sentence in paragraph 51 of the Christensen declaration, which made the sweeping representations "that the pentobarbital providers 'have typically kept' all of the withheld information 'private, have specifically designated the information as proprietary and/or confidential, and have expressly required or requested that the Government maintain the information as confidential to the greatest extent possible under the law.'" *Id.* (quoting Christensen declaration, JA112 (¶ 51)). But the district court failed to appreciate that these supposedly dispositive confidentiality representations apply to the withheld contract terms *only* if the terms identify the Bureau's pentobarbital contractors.

In the sentence the district court homed in on, Ms. Christenson asserted that all the information "described above" is typically kept private and treated as such. JA112 (¶ 51). As relevant here, the information "described above" is "any information that *could lead to the identity of* any … individual or company" involved in the supply of pentobarbital "for lethal injection purposes." JA111 (¶ 48) (emphasis added). According to Ms. Christensen, the Bureau withheld

certain contract terms only because they could lead to the identity of a contractor. *Id.* In other words, the Bureau claimed that contractors typically keep private identifying information like the contract terms it listed; the Bureau did not indicate that contractors otherwise keep private contract terms like drug price, quantity, expiration date, and the like.

The record elsewhere confirms the link that the Bureau drew between its confidentiality representations and its claim that the withheld contract terms could identify contractors. The substantive portions of the Christenson declaration, together with the Winter declaration and the Bureau's briefing in the district court, all clearly indicate that paragraph 51 of the Christenson declaration meant that contractors in the pentobarbital supply chain "have typically kept" identifying information private; "have specifically designated" their participation in pentobarbital supply and testing as private; and "have expressly required or requested" express assurances from the government that this identity information will remain private. JA112 (¶ 51).

For example, immediately after this paragraph, Ms. Christenson elaborated: "This information is kept private because those individuals and companies involved" in the government's pentobarbital procurement "are well aware" of the "negative publicity" and other consequences they will face "when it is discovered that *they* are providing" the drug for lethal injections. JA112-113 (¶ 52) (emphasis

added).  She then discussed in detail the potential consequences the contractors

may face when identified and their fears of being identified, *see* JA113-115 (¶¶ 53-

57), before explaining that, "[d]ue to these fears" the Bureau has safeguarded the

contractors' identities by "restrict[ing] communications with, and knowledge of"

them within the agency, JA115 (¶ 58).

Mr. Winter similarly described pentobarbital contractors' desires to avoid

the negative publicity and other risks associated with having their identities

revealed.  *See* JA165-168 (¶¶ 17-19).  He did not assert any other basis for

confidentiality as to the withheld contract terms.  He represented that:

- Based on the risks flowing from negative publicity, pentobarbital
  contractors participate in the government's procurement of the drug "only
  under assurance of confidentiality" that their "information," i.e., their
  "identit[ies]," will not "be disclosed."  JA168 (¶ 20).

- "[A] company's identity as a supplier of lethal injection substances or as
  someone providing critical related services … is customarily and actually
  kept private, and as such, is confidential."  *Id.* (¶ 21).

- "BOP's current supplier of Pentobarbital in active pharmaceutical
  ingredient ('API') form and its current supplier of compounded
  Pentobarbital … are extremely concerned about maintaining the
  confidentiality of their participation in BOP's lethal injection procedures."
  JA168-169 (¶ 22).

- "BOP has provided such companies with express assurances that, to the
  extent possible, their identities, contact information, and the fact or
  substance of any communication with BOP, including among other

discussions, any negotiations regarding capability, price, and delivery of such substances or services, would remain confidential."  JA169 (¶ 24).

Consistent with these declarations, the Bureau did not dispute in its briefing to the district court that the Bureau's withholdings of the key contract terms hinged on the terms being identifying.  *See* JA244-245 ("Because BOP does not argue that this information is otherwise confidential, BOP's invocation of Exemption 4 turns on whether the information actually is or could be identifying.  Without that link, BOP has not offered any evidence that the information is 'customarily and actually treated as private.'"); *see also* JA314-315, 351-352.  To the contrary, the government readily agreed.  The sole justification it offered for confidentiality is that pentobarbital contractors keep identifying information private.  It stated:

> BOP's declarants amply explained that companies keep their *identity* as a supplier of pentobarbital or related critical services private and BOP has provided them with express assurances that, to the extent possible, their *identities* and *contact information* will remain confidential.

JA314 (emphases added).  The Bureau then proceeded to argue that the other contract terms at issue could identify contractors.  *See* JA314-315.  In its briefing to the district court, the Bureau offered no other justifications for keeping these terms confidential besides the possibility that they could be used to identify contractors.

The district court therefore erred in holding that the key contract terms' identifying power had no relevance.  Only if the terms identify the Bureau's contractors can the terms be considered confidential.

## B. The Bureau Failed To Substantiate That The Withheld Contract Terms Are Identifying

The Bureau failed to show that any of the following information is identifying, and thus, by the agency's own justification, confidential:  drug price, quantity, expiration dates, invoices, container units, lot numbers, purchase order/reference numbers, substance description, concentration, packaging details, and dates of purchase, service, and/or delivery.  *See* JA245-246, 352-353.[12]  The district court did not assess the strength (or lack thereof) of the Bureau's explanation that this information would identify its contractors.

It is well established that the government bears the burden of proving that it has satisfied the requirements of a claimed FOIA exemption.  *See Norton*, 309 F.3d at 32.  The government may "discharge this burden" by "submit[ting] a declaration from an appropriately qualified official attesting to the basis for the agency's

---

[12]     As CREW made clear in the district court, it does not dispute the confidentiality of other information that CREW agrees could be used to identify contractors.  *See* JA244 n.4, 352 n.8.  "[N]ames, titles, department titles, account numbers, phone and fax numbers, web addresses, physical addresses, video conference ID numbers, IT information, company logos, and company brochures" are plainly identifying.  JA244 n.4; *see* JA111 (¶ 48).

decision," provided that the declaration affords the "requester a meaningful opportunity to contest, and the … court an adequate foundation to review, the soundness of the withholding." *Campbell*, 164 F.3d at 30 (quotations omitted).

In particular, the government must provide "*detailed* and *specific* information" to justify its withholdings under a FOIA exemption, such that it is evident why the "material withheld is *logically* within the domain of the exemption claimed." *Id.* (emphases added and quotations omitted); *see also*, *e.g.*, *Larson v. Department of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (an agency's justification must be "logical or plausible" (quotations omitted)). In other words, the agency must "draw [a] connection between the documents at issue and the general standards" and particular requirements "that govern the … exemption." *Campbell*, 164 F.3d at 31. It follows that conclusory, generalized, and speculative allegations are insufficient, as are allegations that simply recite statutory standards. *See id.* at 30 ("An affidavit that contains merely a categorical description of redacted material coupled with categorical indication of anticipated consequences of disclosure is clearly inadequate." (cleaned up)); *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854, 870 (D.C. Cir. 1980) ("The courts will not speculate as to whether [an] Exemption [ ] might, under some possible congruence of circumstances not proven or even asserted be properly applied to … documents,

nor will we assume that all the necessary conditions are met merely because the agency invokes an exemption.").

The Bureau simply did not explain how drug concentrations, lot numbers, container units, purchase order/reference numbers, or expiration dates could be used to identify its contractors. This failure is dispositive. *See Campbell*, 164 F.3d at 30 (a specific and detailed explanation is required).

Regarding packaging details and invoice/pricing information, the Exemption 7(A) portion of the Christenson declaration hypothesized that "*if* a particular company is known or discovered to package or price a substance in a particular way, … the manner in which it is described in BOP's records could be used to trace the substance back to that particular provider by the process of comparison and elimination." JA315 (ellipsis in original and emphasis added) (quoting JA134-135 (¶ 116)). And regarding dates of purchase, the Bureau also offered only speculation: that this information "could be compared to reporting logs or databases maintained by the Drug Enforcement Agency" to potentially determine or narrow down supplier identities. JA315 (quoting JA134 (¶ 115)). The Bureau's speculation in no way discharged its burden to provide a detailed and specific showing that the packaging details, invoice/pricing information, and purchase dates were identifying, and therefore confidential, information. *Campbell*, 164 F.3d at 30.

Courts routinely reject similarly insufficient showings. *See, e.g.*, *McDonnell Douglas Corp. v. U.S. Dep't of Air Force*, 375 F.3d 1182, 1191-1192 (D.C. Cir. 2002) (company failed to meet its burden of showing that disclosure would enable third party to calculate information protected by Exemption 4); *Acumenics Res. & Tech. v. U.S. Dep't of Just.*, 843 F.2d 800, 807-808 (4th Cir. 1988) (similar); *see also WP Co. LLC v. U.S. Small Bus. Admin.*, 502 F. Supp. 3d 1, 13-14 (D.D.C. 2020) (government failed to meet its burden of proving its "core assumption" that loan data, which was not "*per se* confidential," had to be withheld under Exemption 4 because its disclosure would necessarily reveal confidential payroll information (emphasis in original)).

To gloss over these gaps, the Bureau disclaimed any obligation to "spell out" how any of the information in dispute is identifying. JA315. The Bureau argued that additional justification "would provide a road map" to identifying the contractors. *Id.* But this Court rejected a similar argument in *Campbell*. There, the government tried to withhold FBI records on James Baldwin under Exemption 1, which protects classified information. The government attempted to justify the lack of detail explaining its withholdings by arguing that "providing more detail would 'risk[ ] the disclosure of the very information that [it] was attempting to protect'" regarding intelligence methods such as surveillance and monitoring techniques. *Campbell*, 164 F.3d at 31. The Court held that more was needed,

reasoning that the government "should not have difficulty describing the context and nature of the withheld information without revealing its substance" and had no basis to "baldly assert that such material is so sensitive that the FBI is incapable of providing any descriptive information." *Id.* So too here. The Bureau could surely provide basic descriptions about how drug concentrations and the like have any identifying power, without providing a "roadmap."

In enacting FOIA, "Congress intended to curb th[e] apparently unbridled discretion" that the government previously had to withhold information and "deny legitimate information to the public." *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 150 (1989) (quotations omitted). Here, the blank check the district court gave to the government is contrary to FOIA's purpose and the requirements of the confidentiality prong.

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

/s/ Jessica A. Lutkenhaus
JESSICA A. LUTKENHAUS
ARI HOLTZBLATT
YOSEPH T. DESTA*
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000
jessica.lutkenhaus@wilmerhale.com

*Admitted to practice only in California. Supervised by members of the firm who are members of the District of Columbia Bar.*

NIKHEL S. SUS
CITIZENS FOR RESPONSIBILITY AND
   ETHICS IN WASHINGTON
1331 F Street NW, Suite 900
Washington, DC 20004
(202) 408-5565
nsus@citizensforethics.org

*Counsel for Appellant*

March 22, 2022

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.    Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 12,114 words.

2.    The brief has been prepared in proportionally spaced typeface using Microsoft Word 2017 in 14 point Times New Roman font. As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

# ADDENDUM

**(a)** Each agency shall make available to the public information as follows:

***

    **(4)**

***

        **(B)** On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).

**(b)** This section does not apply to matters that are—

    **(1)**

        **(A)** specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and

        **(B)** are in fact properly classified pursuant to such Executive order;

    **(2)** related solely to the internal personnel rules and practices of an agency;

    **(3)** specifically exempted from disclosure by statute (other than section 552b of this title), if that statute—

        **(A)**

            **(i)** requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

        (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

    (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(5) inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested;

(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information

    (A) could reasonably be expected to interfere with enforcement proceedings,

*** 

    (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source,

    (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or

***

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of March, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Jessica A. Lutkenhaus
JESSICA A. LUTKENHAUS