ORAL ARGUMENT SCHEDULED ON OCTOBER 20, 2022
No. 21-5276

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,

*Plaintiff-Appellant*,

*v.*

UNITED STATES DEPARTMENT OF JUSTICE,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the District of Columbia, No. 1:19-cv-3626-DLF
Before the Honorable Dabney L. Friedrich

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

NIKHEL S. SUS
CITIZENS FOR RESPONSIBILITY AND
   ETHICS IN WASHINGTON
1331 F Street NW, Suite 900
Washington, DC 20004
(202) 408-5565

JESSICA A. LUTKENHAUS
ARI HOLTZBLATT
YOSEPH T. DESTA
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

August 12, 2022

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

GLOSSARY ........................................................................................................ vi

SUMMARY OF ARGUMENT ............................................................................1

ARGUMENT .......................................................................................................2

I.   THE BUREAU FAILS TO SHOW THAT THE IDENTITIES OF ITS
     PENTOBARBITAL CONTRACTORS ARE "COMMERCIAL"
     INFORMATION UNDER EXEMPTION 4 ..............................................................2

     A.   Exemption 4's Text Forecloses The Bureau's Reliance
          On Potential Consequences Of Disclosure .........................................2

     B.   The Bureau Fails To Explain How The Identities Of Its
          Pentobarbital Contractors Are Commercial In And Of
          Themselves .........................................................................................8

     C.   The Bureau Relies On Consequences Of Disclosure That
          Are Irrelevant To Whether Information Is "Commercial" .................10

          1.   The Bureau Wrongly Relies On Reputation-Based
               Consequences .............................................................................10

          2.   The Bureau Improperly Relies On The Attenuated
               Financial Impact Of Disclosure .................................................14

          3.   The Bureau Improperly Relies On The Impact Of
               Disclosure On The Government's Interests ..............................15

II.  THE BUREAU FAILS TO SHOW THAT CERTAIN NON-IDENTIFYING
     CONTRACT TERMS ARE "CONFIDENTIAL" INFORMATION UNDER
     EXEMPTION 4 ..............................................................................................17

     A.   The Bureau Shirks Its Burden To Show That Key
          Contract Terms Are Identifying And Therefore
          Confidential ........................................................................................17

B.  The Bureau Only Speculates That The Key Contract
    Terms Are Identifying ........................................................................21

C.  The Bureau's Release Of Records In The *Execution
    Protocol Cases* Forecloses Its Confidentiality Claim Here
    As To Certain Information ................................................................26

CONCLUSION ...........................................................................................29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

## CASES

Page(s)

*Acumenics Research & Technology v. U.S. Department of Justice*,
843 F.2d 800 (4th Cir. 1988) ..........................................................23

*Afshar v. Department of State*, 702 F.2d 1125 (D.C. Cir. 1983) ......................27, 28

*Animal Legal Defense Fund v. FDA*, 790 F. App'x 134 (9th Cir. 2020) ...............20

*Arieff v. U.S. Department of the Navy*, 712 F.2d 1462 (D.C. Cir. 1983)................25

*Baker & Hostetler LLP v. U.S. Department of Commerce*,
473 F.3d 312 (D.C. Cir. 2006)....................................................................5, 7

*Campbell v. U.S. Department of Justice*, 164 F.3d 20 (D.C. Cir. 1998) ..................................................................19, 23, 24

*Center for Biological Diversity v. U.S. Fish & Wildlife Service*,
802 F. App'x 309 (9th Cir. 2020)....................................................20

*Center for National Security Studies v. U.S. Department of Justice*,
331 F.3d 918 (D.C. Cir. 2003)...............................................24, 25

*CIA v. Sims*, 471 U.S. 159 (1985) .......................................................25

*CNA Financial Corp. v. Donovan*, 830 F.2d 1132 (D.C. Cir. 1987)......................27

*Cottone v. Reno*, 193 F.3d 550 (D.C. Cir. 1999) ......................................26, 27, 28

*Critical Mass Energy Project v. Nuclear Regulatory Commission*,
830 F.2d 278 (D.C. Cir. 1987).........................................................5

*Donnell v. Herring-Hall-Marvin Safe Co.*, 208 U.S. 267 (1908).............................8

*Electronic Privacy Information Center v. U.S. Department of Homeland Security*, 117 F. Supp. 3d 46 (D.D.C. 2015)................................6

*Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134 (2018)...................................7

---

[*]     Authorities upon which we chiefly rely are marked with asterisks.

- iii -

*Evans v. Federal Bureau of Prisons*, 951 F.3d 578 (D.C. Cir. 2020) ...............21, 23

\*Food Marketing Institute v. Argus Leader Media,
139 S. Ct. 2356 (2019)........................................................................12, 17, 20

*Getman v. NLRB*, 450 F.2d 670 (D.C. Cir. 1971).......................................................6

*Humane Society International v. U.S. Fish & Wildlife Service*, No. CV
16-720 (TJK), 2021 WL 1197726 (D.D.C. Mar. 29, 2021) ..........................20

*Judicial Watch, Inc. v. U.S. Department of Health & Human Services*,
525 F. Supp. 3d 90 (D.D.C. 2021)........................................................9, 27, 28

*McDonnell Douglas Corp. v. U.S. Department of Air Force*,
375 F.3d 1182 (D.C. Cir. 2004).......................................................................23

*Military Audit Project v. Casey*, 656 F.2d 724 (D.C. Cir. 1981).............................20

*Milner v. Department of Navy*, 562 U.S. 562 (2011) ..............................................16

*Motschenbacher v. R.J. Reynolds Tobacco Co.*, 498 F.2d 821 (9th Cir.
1974) .................................................................................................................8

\*National Association of Home Builders v. Norton,
309 F.3d 26 (D.C. Cir. 2002)...................................................................4, 5, 7

*New York Times Co. v. FDA*, 529 F. Supp. 3d 260 (S.D.N.Y. 2021).....................19

*Niagara Mohawk Power Corp. v. U.S. Department of Energy*,
169 F.3d 16 (D.C. Cir. 1999)...........................................................................28

\*Public Citizen Health Research Group v. FDA, 704 F.2d 1280 (D.C.
Cir. 1983) ......................................................................................................5, 9

*Public Citizen v. U.S. Department of Health & Human Services*,
975 F. Supp. 2d 81 (D.D.C. 2013).................................................................11

*Russello v. United States*, 464 U.S. 16 (1983) ..........................................................3

*SafeCard Services, Inc. v. Securities and Exchange Commission*,
926 F.2d 1197 (D.C. Cir. 1991)......................................................................20

*Shapiro v. U.S. Department of Justice*, 239 F. Supp. 3d 100 (D.D.C.
2017) ...............................................................................................................25

*U.S. Department of State v. Ray*, 502 U.S. 164 (1991) ...........................................14

**United Technologies Corp. v. U.S. Department of Defense*,
601 F.3d 557 (D.C. Cir. 2010).........................................................10, 11, 12

*Wolf v. CIA*, 473 F.3d 370 (D.C. Cir. 2007) ...........................................................27

*WP Company LLC v. U.S. Small Business Administration*, 502 F.
Supp. 3d 1 (D.D.C. 2020) ...............................................................................23

## STATUTES AND RULES

*5 U.S.C. § 552 ..............................................................................................................3

## DOCKETED CASES

*United Technologies Corp. v. U.S. Department of Defense*, Nos. 08-
5435, 5436, Brief for Plaintiffs-Appellants, 2009 WL 6055887
(D.C. Cir. Sept. 22, 2009) ...............................................................................12

## OTHER AUTHORITIES

Allen, Jonathan, *Special Report: How the Trump Administration
Secured a Secret Supply of Execution Drugs*, Reuters (July 10,
2020), https://www.reuters.com/article/us-usa-executions-
specialreport/special-report-how-the-trump-administration-
secured-a-secret-supply-of-execution-drugs-idUSKBN24B1E4. .................22

Pozen, David E., *The Mosaic Theory, National Security, and the
Freedom of Information Act*, 115 Yale L.J. 628 (2005)................................24

# GLOSSARY

| | |
|---|---|
| Bureau | Federal Bureau of Prisons |
| CREW | Citizens for Responsibility and Ethics in Washington |
| EFF | Electronic Frontier Foundation |
| EPIC | Electronic Privacy Information Center |
| FOIA | Freedom of Information Act |
| JA | Joint Appendix |

## SUMMARY OF ARGUMENT

The Bureau's argument for withholding the identities of pentobarbital contractors ignores Exemption 4's statutory text and misconstrues the cases applying it.  The Bureau insists information is "commercial" under Exemption 4 whenever its disclosure might cause downstream financial consequences.  But both the statutory language and this Court's precedent make clear that information is "commercial" only when it is itself commercial in nature or function.  Pentobarbital contractors' identities lack any such commercial nature or function.  The Bureau therefore errs in focusing on negative publicity and the financial impact that disclosure could cause for these entities.  What's more, the Bureau relies on considerations—such as contractors' reputational fears and the Bureau's concern for maintaining *its* pentobarbital supply—that have no relevance to Exemption 4.  The Bureau would have this Court stretch Exemption 4's text beyond its limit, shielding the identities of any government contractor with ties to capital punishment or any other activity for which the government fears its use of taxpayer dollars could generate public controversy.  Under this upside-down interpretation, strong public interest would be a basis for withholding information rather than disclosing it.  FOIA requires the opposite.

The Bureau's arguments for withholding as "confidential" certain key contract terms similarly distort this Court's precedent and disregard FOIA's pro-

transparency purpose.  The Bureau's sole basis for asserting that these terms are customarily kept private is its belief that they could be used to identify pentobarbital contractors.  At the same time, the Bureau claims it has no obligation to show the terms are actually identifying.  That shirks the Bureau's burden.  This Court's cases require the Bureau to substantiate the premise of its confidentiality claim, which means it must establish that the contract terms are actually identifying.  The Bureau fares no better in alternatively arguing that it has satisfied its burden.  Its arguments rest exclusively on speculation that the contract terms could, if disclosed, potentially be compared with other public or nonpublic information to identify contractors.  And, at least with respect to two of these terms—drug concentrations and expiration dates—the Bureau's prior public disclosures foreclose any confidentiality claim here.

The decision below should be reversed.

## ARGUMENT

## I. THE BUREAU FAILS TO SHOW THAT THE IDENTITIES OF ITS PENTOBARBITAL CONTRACTORS ARE "COMMERCIAL" INFORMATION UNDER EXEMPTION 4

### A. Exemption 4's Text Forecloses The Bureau's Reliance On Potential Consequences Of Disclosure

The Bureau ignores Exemption 4's plain meaning and fails to respond to CREW's textual analysis demonstrating that "commercial" information must itself have a commercial nature or function (Opening Br. 17-21).  It instead argues that

information is "commercial" whenever the entity providing the information has a "commercial interest at stake in its disclosure." *E.g.*, Br. 18. It then asserts, echoing the district court, that pentobarbital contractors have a "commercial interest" in shielding their identities because disclosure would "risk … negative publicity" and in turn lead to "financial consequences" such as "diminished sales." *Id.* at 18, 22, 24; *see* JA418-419.

The Bureau nowhere attempts to reconcile its focus on the consequences of disclosure with the statutory text. Nor could it. As CREW explained, "commercial" is an adjective in Exemption 4 that modifies "information," not disclosure. The exemption therefore requires that information *itself* be commercial, not that disclosure of information produce a commercial impact. Opening Br. 16-25. By contrast, where Congress was concerned with disclosure consequences—as in Exemptions 6 and 7—it used different language focused on disclosure. If that is what Congress intended in Exemption 4, it could have protected information where "disclosure … would constitute … clearly unwarranted [commercial consequences]," 5 U.S.C. § 552(b)(6), or "to the extent that the production of such [commercial] records or information … could reasonably be expected to interfere with [commercial activities]," *id.* § 552(b)(7). Congress's choice not to use such consequence-focused language in Exemption 4 must be given effect. *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983).

The Bureau claims that its atextual reading is compelled by this Court's precedent, but misreads the cases it cites. Contrary to what the Bureau argues (at 21, 29), the Court did not hold in *National Ass'n of Home Builders v. Norton*, 309 F.3d 26 (D.C. Cir. 2002), that disclosure consequences may render information commercial under Exemption 4. In fact, the Court held that "information is 'commercial' under this exemption if, '*in and of itself*,' it serves a 'commercial function' or is of a 'commercial nature.'" *Id.* at 38 (emphasis added); *see* Opening Br. 21.

The Bureau takes language from *Norton* out of context. It asserts that Exemption 4's commercial requirement "is satisfied whenever the information has a 'connection with a commercial enterprise' or 'the parties who supplied the … information have a commercial interest at stake in its disclosure.'" Br. 21 (quoting *Norton*, 309 F.3d at 39) (ellipses in original, emphasis omitted). But consider the broader passage that the Bureau selectively quotes from:

> We are unpersuaded that owl-sighting information qualifies as "commercial or financial" information simply because it was provided pursuant to a government-to-government cooperative agreement. … Such a quid-pro-quo exchange between governmental entities does not constitute a commercial transaction in the ordinary sense. No "business information" is involved, and the owl-sighting data itself is commercial neither by its nature (having been *created by the government rather than in connection with a commercial enterprise*) nor in its function (as there is *no evidence that the parties who supplied the owl-sighting information have a commercial interest at stake in its disclosure*).

- 4 -

*Norton*, 309 F.3d at 38-39 (citations omitted, emphases added).  As the passage

demonstrates, the *Norton* Court referred to "connection with a commercial

enterprise" and "commercial interest at stake in its disclosure" in parentheticals, to

explain why *government-collected* information, exchanged in a *government-to-

government* cooperative agreement, has no commercial nature or function.  And it

did so solely as part of a broader analysis into whether the owl-sighting

information was commercial "in and of itself."  *Id.* at 38.  *Norton* nowhere else

discusses the consequences of disclosure with respect to Exemption 4.  This stands

in stark contrast to the Court's analysis of Exemption 6, which consumes ten

paragraphs analyzing the potential consequences of disclosure.  *Id.* at 33-37.  At

most, *Norton* indicates that disclosure may, in some cases, shed light on whether

the information itself is commercial.  *Norton* did not hold that noncommercial

information becomes commercial simply because disclosure might cause a

commercial impact.

The Bureau likewise misinterprets four other cases as establishing that

courts in this Circuit "routinely consider[] the commercial effect of disclosure."

Br. 30-31 (discussing *Public Citizen Health Research Group v. FDA*, 704 F.2d

1280 (D.C. Cir. 1983); *Critical Mass Energy Project v. Nuclear Regulatory

Commission*, 830 F.2d 278 (D.C. Cir. 1987), *vacated on other grounds by* 975 F.2d

871 (D.C. Cir. 1992); *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d

312 (D.C. Cir. 2006); *Electronic Privacy Information Center v. U.S. Dep't of Homeland Security*, 117 F. Supp. 3d 46 (D.D.C. 2015) ("*EPIC*")); *see* Opening Br. 22, 24, 28-30, 32-33 (discussing the cases). The Bureau's own discussion of these cases confirms that they turned on whether the information itself had a commercial nature or function, not on the consequences of disclosure. As the Bureau recounts: *Baker* concerned "'market conditions' for [lumber companies'] operations"; *Critical Mass* concerned "health and safety problems" of nuclear power plant operations; *Public Citizen* concerned "health and safety" data of manufacturers that would be "instrumental in gaining marketing approval"; and *EPIC* concerned companies' "cyber vulnerability" issues. Br. 30-31 (quoting cases). All this information is commercial in and of itself because of the critical role it played in the entities' commercial operations. As explained in CREW's opening brief (at 24), to the extent potential consequences of disclosure had relevance in any of these cases, it was as a heuristic for determining whether information is commercial by its nature or function. The Bureau tacitly concedes as much when it states that "commercial consequences of disclosure *can shed light on* whether information is 'commercial' in nature." Br. 31 (emphasis added).

Similarly, the Bureau fails to distinguish *Getman v. NLRB*, 450 F.2d 670, 671 (D.C. Cir. 1971), which held that a "bare" list of names and addresses of employees eligible to vote in certain union representation elections "cannot be

fairly characterized as … 'commercial information.'"  The Bureau argues that, in contrast to *Getman*, here it has established "the way in which disclosure" of identity would affect its pentobarbital contractors.  Br. 27.  But disclosure consequences had no bearing on the resolution of *Getman*'s Exemption 4 analysis—in contrast to its analysis of Exemption 6, where the Court weighed the impact of disclosure on employee privacy and election processes.  450 F.2d at 674-677.

Moreover, contrary to the Bureau's assertion, *Baker* did not hold "that the term 'commercial' 'reaches … broadly.'"  Br. 20 (quoting 473 F.3d at 319) (ellipses in original).  *Baker* stated simply, as a comparative matter, that the term "reaches 'more broadly'" than records that "reveal basic commercial operations … or relate to the income-producing aspects of a business." 473 F.3d at 319.  That comparison does not alter the general rule that "commercial" information must "*in and of itself*" have a commercial nature or function.  *Norton*, 309 F.3d at 38 (emphasis added).

Finally, the Bureau suggests that "[n]othing" in the legislative history "forecloses consideration of commercial consequences."  Br. 28.  But the mere absence of legislative history foreclosing the Bureau's reading cannot overcome plain text and precedent, *see Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134,

1143 (2018), which here clearly establish that information must be "commercial"

"in and of itself" to fall within Exemption 4.

### B.     The Bureau Fails To Explain How The Identities Of Its Pentobarbital Contractors Are Commercial In And Of Themselves

The Bureau fares no better in belatedly attempting to show that the identities

of its pentobarbital contractors are commercial in nature or function.

*First*, the Bureau relies only on a century-old Supreme Court case and Ninth

Circuit footnote—both unrelated to FOIA—for the proposition that "businesses

have a commercial interest in their names."  Br. 25-26 (citing *Donnell v. Herring-*

*Hall-Marvin Safe Co.*, 208 U.S. 267, 272 (1908), and *Motschenbacher v. R.J.*

*Reynolds Tobacco Co.*, 498 F.2d 821, 824 n.10 (9th Cir. 1974)).  Those cases are

readily distinguishable.  They concerned, respectively, trademark infringement by

a successor company and the unauthorized use of a celebrity's name (and likeness,

personality, and endorsement) for an advertising campaign.  In those contexts, the

name itself had proprietary value.  The Bureau does not and cannot argue that its

contractors' names have intrinsic proprietary value here.

*Second*, the Bureau erroneously claims that the identities are commercial

because "the context presented here" shows that releasing contractors' identities

discloses "that they are involved in the procurement or testing of pentobarbital for

use in capital punishment."  Br. 26.  That argument proves too much.  A business's

name and the goods or services it provides are merely basic facts describing the existence of the business. Opening Br. 15. If merely linking a business's name to one of its business activities sufficed to make the name commercial, then information identifying a business would *always* be commercial—as would, seemingly, *any* information associated with the business. This Court has warned against such an expansive reading of Exemption 4, explaining that "not every bit of information submitted to the government by a commercial entity qualifies for protection." *Public Citizen*, 704 F.2d at 1290.

And the Bureau implicitly concedes that identifying information is not always commercial by embracing *Judicial Watch, Inc. v. U.S. Department of Health & Human Services*, 525 F. Supp. 3d 90 (D.D.C. 2021). *See* Br. 32. There, the district court held that the names and addresses of contract laboratories did not qualify as commercial information. The Bureau apparently agrees with the court's conclusion in that case that there was a lack of "adequate[] support" in the government's declarations demonstrating commerciality, *id.*, even though, like here, disclosure of the contract laboratories' names would have linked the laboratories to their own business activities.

- 9 -

C.    **The Bureau Relies On Consequences Of Disclosure That Are Irrelevant To Whether Information Is "Commercial"**

The Bureau compounds its erroneous, atextual reading of Exemption 4 by relying on considerations that would be inadequate even if the Court were to base its "commercial" analysis on the consequences of disclosure.

1.    **The Bureau Wrongly Relies On Reputation-Based Consequences**

The Bureau relies on the harms flowing from negative publicity that pentobarbital contractors may face if their identities are disclosed.  Br. 22-24, 26. But Exemption 4 does not protect information simply because its disclosure could lead to reputational harm—even if that reputational harm may in turn affect an entity's business or economic interests.

At the outset, the Bureau fails to distinguish long-standing precedent holding that Exemption 4 does not guard against negative publicity or other forms of reputational injury.  CREW highlighted, among other cases, *United Technologies Corp. v. U.S. Department of Defense*, 601 F.3d 557, 564 (D.C. Cir. 2010), where this Court explicitly recognized that "Exemption 4 does not guard against mere embarrassment in the marketplace or reputational injury."  *See* Opening Br. 35-36. The Bureau dismisses this precedent on the ground that it concerned the now-defunct substantial competitive harm test from Exemption 4's confidentiality requirement.  *See* Br. 33.  But as CREW explained, these cases considered the

- 10 -

nature of the information at issue and its commercial function—an inquiry that continues to be the touchstone of the "commercial" (but not confidential) prong of Exemption 4.  Opening Br. 36-37; *see supra* 2-6.

There is thus nothing "misplaced" (Br. 34) about CREW's reliance on *Public Citizen v. U.S. Department of Health & Human Services*, 975 F. Supp. 2d 81, 100 (D.D.C. 2013).  That case relied on *United Technologies* to conclude that the identity of agencies investigating certain pharmaceutical companies and the status of those investigations was not "commercial" even though disclosure "may be embarrassing or harmful to the reputation of a company." *Id.* at 107; Opening Br. 37.  Rather than "wrongly appl[y] the substantial competitive harm analysis," Br. 34, the court analyzed *United Technologies* and similar cases to determine that reputational injury "does not convert the information into 'commercial' [information] under Exemption 4," *Public Citizen*, 975 F. Supp. 2d at 107.

The Bureau's reliance on the "economic consequences" that may flow from reputational injury, Br. 34, is foreclosed by the same precedent.  In *United Technologies*, defense contractors sought to shield information evaluating their quality control processes.  They argued not only that the information would be used "to discredit them in the eyes of current and potential customers," but also that competitors would "use the information and accompanying negative publicity" to "persuade" the contractors' customers that their products were suspect.  *United*

*Techs.*, 601 F.3d at 563.  The contractors vigorously disputed that their claims were limited to reputational harm, arguing that they were placed at a competitive disadvantage in bidding contests for contracts.  Br. for Plaintiffs-Appellants at 24-29, *United Techs. v. U.S. Dep't of Defense*, Nos. 08-5435, 5436, 2009 WL 6055887 (D.C. Cir. Sept. 22, 2009).  This Court rejected the contractors' reliance on both direct reputational injury and economic consequences flowing from that injury.  It held that "[c]alling customers' attention to unfavorable agency evaluations or unfavorable press" and the potential "overreact[ion]" of customers was insufficient to trigger Exemption 4.  *United Techs.*, 601 F.3d at 563-564.

In citing the *Argus Leader* dissent (at 34-35), the Bureau fails to acknowledge that the dissenters *endorsed* the view that reputational consequences do not properly implicate Exemption 4.  The dissenters recognized that Exemption 4's "focus on 'commercial' … information … implies that the harm caused by disclosure must do more than, say, simply embarrass the information's owner.  It must cause some genuine harm to an owner's economic or business interests." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2363, 2368 (2019) (Breyer, J., concurring in part and dissenting in part).  *United Technologies* indicates that harms flowing from reputational injury—even if they may affect the company's competitive position—are not the "genuine harm[s] to an owner's economic or business interests" that Exemption 4 is meant to protect.

The Bureau relies entirely on harms from reputational injury that should be disregarded when determining if contractors' identities are "commercial."  In one example, the Bureau suggests that contractors' identities are "commercial" because a blog post invited the public to write a negative Google review of an identified pentobarbital supplier.  Br. 23.  That pentobarbital supplier demanded the return of its lethal injection supply after it was identified, claiming it did "not have the time to deal with … the press, the hate mail[,] … and possible future lawsuits."  *Id.* (alterations in original, quotation marks omitted).  In another example, a publicly identified testing laboratory declared that it would not provide testing services for pentobarbital used in executions because it desired to "avoid controversy and protests from capital punishment opponents."  JA136; *see* Br. 25.  The Bureau's own declarant makes clear that the potential economic harms are all tied to reputational injury, claiming that entities involved in the procurement of pentobarbital "are commonly subject to harassment, threats, and negative publicity *leading to commercial decline*."  JA112-113 (emphasis added).  Such claims of reputational and related harms are not properly considered as part of the "commercial" inquiry.

Considering potential reputational harms and resulting effects on a company's business inverts FOIA's pro-transparency purpose by turning public scrutiny into a basis for withholding rather than disclosing information.  Opening

- 13 -

Br. 13; American Oversight Br. 17; *see also U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (FOIA "was designed to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny" (quotation marks omitted)).  The Bureau's only response is to quote the language of Exemption 4, Br. 35, but that language makes clear that Congress chose *not* to protect commercial entities from the consequences—reputational or otherwise—of disclosing noncommercial information, like the entities' identities.

## 2.   The Bureau Improperly Relies On The Attenuated Financial Impact Of Disclosure

The Bureau further errs because the asserted "commercial" impact for pentobarbital contractors comes at the end of a multi-step sequence of events. Opening Br. 16-17.  Though the Bureau expends considerable effort arguing that any financial harm is not speculative here, such argument misses the point.  The Bureau's problem is that it improperly relies on an *attenuated* causal chain that begins with negative publicity and then depends on the independent actions of third parties—individual and enterprise customers—for any financial impact. Opening Br. 42.  Consider, once again, the blog post example the Bureau relies on. The causal chain from a blog post to negative online reviews of sufficient volume and vitriol to cause a bottom-line market response requires several assumptions and steps.  Across FOIA exemptions, courts have rejected similarly attenuated connections between the withheld information and the exemption's requirements.

Opening Br. 41-42 (discussing examples from Exemptions 2, 5, and 6). And to withhold government contractors' identities simply because of voluntary decisions they may make after disclosure, in response to free speech by the American taxpayers who fund their contracts and the subsequent effects of the free market, would improperly shield them and the Bureau from the very public scrutiny FOIA is designed to enable. Opening Br. 39; American Oversight Br. 3.

### 3.     The Bureau Improperly Relies On The Impact Of Disclosure On The Government's Interests

The Bureau wrongly shifts focus away from the relevant inquiry—the pentobarbital contractors and their commercial information—by repeatedly stressing the impact that disclosure will have on *its* supply of pentobarbital and access to pentobarbital testing services. For instance, the Bureau cites several examples that it claims show that disclosure would "deter [contractors] from … engaging in business transactions for future procurement of lethal injection substances." Br. 22-25 (ellipses in original, quotation marks omitted). As CREW explained (at 44), other exemptions, such as Exemption 7(A), protect the government's interests, but the Bureau has withdrawn its reliance on those exemptions. Exemption 4, by contrast, protects "trade secrets and commercial or financial information," not the government's interests.

The fact that this case intersects with the Bureau's implementation of capital punishment (Br. 22-25) is no excuse to disregard the statute's text. As the

- 15 -

Supreme Court explained in *Milner v. Department of Navy*, FOIA does not provide

discretion to expand an exemption's plain meaning in the name of "workable

agency practice," as the statute and its specified exemptions represent the

particular balance between disclosure and withholding that Congress deemed

appropriate "across the length and breadth of the Federal Government." 562 U.S.

562, 571-572 & n.5 (2011).

And in focusing solely on the death penalty context, the Bureau ignores the

broader repercussions of its Exemption 4 interpretation. Opening Br. 3. Federal

agencies increasingly outsource a host of key functions to private contractors, and

many of these contractors provide goods or services that may be controversial.

The government and its contractors may therefore wish to keep the contractors'

identities secret to avoid public scrutiny. *See* American Oversight Br. 23-25; EPIC

& EFF Br. 4-25. Allowing the identities of contractors to be classified as

commercial information under Exemption 4—which the Bureau's atextual

interpretation would seemingly permit—could have far-reaching, negative

consequences for government oversight and accountability. Indeed, without even

the names of the entities that these agencies contract with, it will be virtually

impossible for the public to effectively scrutinize whether the agencies have

chosen reputable vendors; whether these vendors have fairly contracted with the

agencies and appropriately interacted with government officials; and ultimately,

- 16 -

whether taxpayer dollars are being put to good use.  *See* EPIC & EFF Br. 4, 10-11, 16, 22; American Oversight Br. 25-26.

## II.    THE BUREAU FAILS TO SHOW THAT CERTAIN NON-IDENTIFYING CONTRACT TERMS ARE "CONFIDENTIAL" INFORMATION UNDER EXEMPTION 4

The Bureau also fails to refute CREW's arguments (at 45-53) that the Bureau has not met its burden to show that key contract terms such as drug concentrations, price, and expiration dates are "customarily kept private."[1]  *Argus Leader*, 139 S. Ct. at 2363, 2366.[2]

### A.    The Bureau Shirks Its Burden To Show That Key Contract Terms Are Identifying And Therefore Confidential

Out of the gate, the Bureau misunderstands and therefore mischaracterizes CREW's core argument regarding its burden.

As explained in CREW's opening brief (at 2, 14, 45-49), the Bureau has broadly claimed that *identifying* information is customarily kept private, and it has withheld key contract terms only under this premise.  Yet the Bureau fails to demonstrate that the withheld terms are, in fact, identifying.  *Id.*  In response, the

---

[1]    The Bureau withdrew its previous representation that it was withholding "packaging details."  Br. 43 n.4.

[2]    As CREW noted (at 45 n.11), *Argus Leader* left open the question whether information also had to be provided to the government under an assurance of privacy to be considered confidential under Exemption 4.  CREW stated that this legal question was not at issue on appeal.  But CREW did *not* concede that the Bureau had—as a factual matter—promised the key contract terms would be kept private.  Br. 37 n.5.  CREW expressly disputed this point.  Opening Br. 48-49.

Bureau focuses on a single sentence in Kara Christenson's declaration that makes a sweeping assertion of confidentiality:  that "the individuals/companies providing the information have typically kept it private, have specifically designated the information as … confidential, and have expressly required or requested that the Government maintain the information as confidential."  Br. 40 (quoting JA112) (ellipses in original).  The Bureau refuses to address the many preceding and subsequent paragraphs in her declaration, as well as those in Rick Winter's declaration, clearly indicating that this sentence concerns *identifying* information, and therefore applies to the key contract terms only if they have identifying power. Opening Br. 46-49.  The Bureau does not otherwise state that pentobarbital contractors keep these specific terms private, regardless of their identifying power.

Moreover, the record makes clear that the *Bureau*—not the pentobarbital contractors—determined that these key contract terms should be kept confidential, based on *its* view that the information was identifying.  The Christenson declaration states:  "In addition to information that directly identifies those involved in [the Bureau]'s procurement of Pentobarbital, [*the Bureau*] *determined* that other information included in the records could reveal the identity of those involved."  JA134 (emphasis added).  The declaration goes on to list the key contract terms now in dispute.  *Id.*  In ignoring this record evidence, the Bureau repeats the district court's error:  disregarding the clear connection between the

Bureau's confidentiality claim and the identifying power of the withheld contract terms. Opening Br. 45-46.

All CREW argues, then, is that the Bureau must substantiate this connection by showing that the key contract terms in dispute are in fact identifying. That requirement follows from the fundamental principle, cutting across FOIA exemptions, that the Bureau must provide "detailed and specific information" showing how "material withheld is logically within the domain of the exemption claimed." *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998) (quotation marks omitted); *see also* Opening Br. 50-51 (citing authorities). In characterizing CREW's "focus on the adequacy" of the Bureau's justification as "misplaced," Br. 39, the Bureau dismisses basic precedent and seeks to avoid its burden under Exemption 4.

The Bureau also cannot prevail even under its selective reading of the Christenson declaration. *Argus Leader* did not disturb the basic FOIA principle that the government must provide concrete, specific declarations to satisfy the requirements of any exemption. Cases applying *Argus Leader* have thus continued to reject conclusory assertions of confidentiality—like the one on which the Bureau relies here—that simply parrot *Argus Leader* and indiscriminately apply to all withheld information. *See New York Times Co. v. FDA*, 529 F. Supp. 3d 260, 284-285 (S.D.N.Y. 2021) ("[A] company cannot readily ward off disclosure *simply*

by 'invok[ing] the magic words—"customarily and actually kept confidential"

…."' (citation omitted, second alteration in original)); *Humane Soc'y Int'l v. U.S.*

*Fish & Wildlife Serv.*, No. CV 16-720 (TJK), 2021 WL 1197726, at *4 (D.D.C.

Mar. 29, 2021), *appeal dismissed*, No. 21-5239 (D.C. Cir. Mar. 11, 2022).[3]

    Neither case that the Bureau cites (at 39-40) is to the contrary.  *Military*

*Audit Project v. Casey* instructs that a government affidavit must "describe the …

justifications for nondisclosure with reasonably specific detail."  656 F.2d 724, 738

(D.C. Cir. 1981).  The Bureau's affidavits here stand in contrast to the "extensive

affidavits by high government officials" in that case, which provided meticulous

"detail[] [on] the nature of the material withheld [under Exemption 1] and the

implications for the national security should it be released," as well as the proper

classification of the materials, as required by Exemption 1.  *Id.* at 727, 737.

*SafeCard Services, Inc. v. Securities and Exchange Commission* offers similar

guidance, and its discussion of the presumption of good faith for agency affidavits

---

[3]    *Argus Leader* had no occasion to discuss what the government must show to
prove that information is customarily kept private, as the plaintiff in that case
conceded the requirement had been met.  139 S. Ct. at 2361.  No Court of Appeals
has directly addressed this question post-*Argus Leader*.  But in the course of
remanding cases pending on appeal when *Argus Leader* was decided, the Ninth
Circuit has suggested that the government should develop a factual record of the
"specific steps" that entities have taken to keep the information in question private.
*Animal Legal Def. Fund v. FDA*, 790 F. App'x 134, 136 (9th Cir. 2020); *see
Center for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 802 F. App'x 309,
310 (9th Cir. 2020).

does not obviate the Bureau's need to actually substantiate an exemption claim.

926 F.2d 1197, 1200 (D.C. Cir. 1991); *see Evans v. Federal Bureau of Prisons*,

951 F.3d 578, 584 (D.C. Cir. 2020).  In neither of these cases did courts fill in

evidentiary gaps for the government, as the Bureau asks the Court to do here.

### B.    The Bureau Only Speculates That The Key Contract Terms Are Identifying

The Bureau has not shown that any of the key contract terms would, if

disclosed, identify pentobarbital contractors.  The "detailed" supporting

descriptions it claims to have provided are, in reality, speculation.  Br. 48.

As an initial matter, everything the Bureau relies upon from the record

comes from its justifications under Exemption 7, not Exemption 4.  Br. 43-45

(citing JA134-135).  And the material the Bureau pulls from its Exemption 7

justifications depends, as already explained, on a speculative and attenuated chain

of reasoning.  Opening Br. 52.  Someone *could* compare any disclosed information

to bits and pieces of *other* information in *other* public or *nonpublic* sources

(including sources obtained through *other* FOIA requests), and that *could* in turn

reveal the identity of the disclosing entity or at least narrow down the options.  Br.

43-45.  Consider the following descriptions from the Bureau's brief:

- "[I]nformation regarding drug quantity, timing, and 'dates of purchases' could 'be compared' to [Drug Enforcement Administration] 'reporting logs' … or to other 'publicly-available data, or data gained through other non-related requests or discovery.'"  Br. 43-44 (quoting JA134).

- 21 -

- If public or nonpublic records disclose that a "particular company … price[s] a substance" or "test[s] a product in a particular way," specific descriptions in the withheld records "could be used to trace the substance back to that particular provider by the process of comparison and elimination." Br. 44 (quoting JA134-135).

- "[I]nvoices … could be analyzed and compared to those obtained either in a public forum or through other FOIA requests to specifically identify which company(ies) produced them." Br. 44 (quoting JA135).

Each of these examples simply speculates about what the public could potentially do to identify contractors with *other* information that may not even be public.

The Bureau also wrongly asserts that a 2020 *Reuters* article identifying three pentobarbital testing laboratories proves the information at issue here could be used to identify a particular company. Br. 45. The article indicates that Reuters identified the laboratories from partially redacted laboratory reports that the government produced in litigation, but does not explain what particular terms in those reports—if any—led to the identification. *See* Allen, *Special Report:  How the Trump Administration Secured a Secret Supply of Execution Drugs*, Reuters (July 10, 2020).  All the Bureau can argue is that the unredacted expiration dates and concentrations "presumably" contributed to identification, Br. 45-46, although the lab reports included other unredacted terms and formatting not in dispute here. Moreover, the article reveals nothing about whether any other contract terms in dispute here (*e.g.*, drug prices, dates of purchase) have identifying power.

- 22 -

The Bureau fails (at 46-47) to distinguish cases that have rejected similarly speculative showings. That *McDonnell Douglas Corp. v. U.S. Department of Air Force*, 375 F.3d 1182 (D.C. Cir. 2004), and *Acumenics Research & Technology v. U.S. Department of Justice*, 843 F.2d 800 (4th Cir. 1988), were decided before *Argus Leader* in no way diminishes their holdings that agencies cannot sustain confidentiality assertions with mere conjecture. Since *Argus Leader*, this Court has reaffirmed that an agency must "show, with reasonable specificity, why the documents [withheld] fall within the exemption." *Evans*, 951 F.3d at 583. *WP Company LLC v. U.S. Small Business Administration*, 502 F. Supp. 3d 1, 16 (D.D.C. 2020), illustrates this principle. It involved information (loan data) that the agency defendant claimed was confidential *only* because of its power to necessarily reveal other, actually confidential information (payroll information). *Id.* at 13-14. The agency, like the Bureau here, supported this linkage with bare speculation, and its Exemption 4 claim consequently failed.

Further, CREW's reliance on *Campbell*, 164 F.3d 20, is not "misplaced." Br. 47. In *Campbell*, the Court held that the FBI erred in withholding information under Exemption 1 because it relied on generalized assertions that disclosure risked revealing current intelligence gathering methods and that more specific justifications would risk revealing those methods. 164 F.3d at 31. The Bureau makes a similar error here. Though it purports to offer "detailed descriptions of the

- 23 -

information" regarding the identifying power of particular contract terms, Br. 48, this information is, as discussed, merely the Bureau's *guesswork* regarding the potential linkages between terms and other public or nonpublic information. *See supra* 21-22. The Bureau must do more than simply hypothesize that, for example, dates of purchase *could* be compared to nonpublic data obtained by other FOIA requests or in litigation via discovery. *See Campbell*, 164 F.3d at 30 (agency must provide "detailed and specific information" showing how "material withheld is logically within the domain of the exemption claimed"); *supra* 21-22.

Finally, the Bureau cannot overcome these failures by arguing that disclosure in the aggregate risks outing pentobarbital contractors. According to the Bureau, the contract information *could*, if released, "be pieced together" like a "puzzle" or "mosaic" to identify particular companies. Br. 45, 48-49. The Bureau has never previously made this argument and for good reason.

There is no precedent for applying a "mosaic" theory under Exemption 4. Courts have only ever applied such a theory to exemptions "in the context of national security." *Center for Nat'l Sec. Stud. v. U.S. Dep't of Justice*, 331 F.3d 918, 928 (D.C. Cir. 2003); *see* Pozen, *The Mosaic Theory, National Security, and the Freedom of Information Act*, 115 Yale L.J. 628, 633-661 (2005). All of the cases that the Bureau cites (at 49) involved information that, if disclosed, could implicate national security investigations or intelligence sources and methods. *See*

*Shapiro v. U.S. Dep't of Justice*, 239 F. Supp. 3d 100, 115 (D.D.C. 2017) (applying

mosaic theory to allow FBI to withhold prior FOIA request search slips and notes

implicating ongoing terrorism investigations); *CIA v. Sims*, 471 U.S. 159, 178

(1985) (explaining "bits and pieces of data 'may aid in piecing together bits of

other information'" in the particular "context" of assessing "the very nature of the

intelligence apparatus of any country," and withholding institutional affiliation of

intelligence sources for CIA-financed research project).  The mosaic theory applies

only to these narrow FOIA contexts because of the "great deference" that courts

accord the government on national security matters.  *Sims*, 471 U.S. at 179; *see*

*Center for Nat'l Sec. Stud.*, 331 F.3d at 926-928.

 This Court has rejected attempts to extend the mosaic theory beyond the

national security context.  In *Arieff v. U.S. Department of Navy*, 712 F.2d 1462

(D.C. Cir. 1983), which concerned the names and amounts of prescription drugs

supplied by the Navy to members of Congress, the Court acknowledged that "each

individual piece of *intelligence* information, much like a piece of jigsaw puzzle,

may aid in piecing together other bits of information" to reveal "covert" data.  *Id.*

at 1467 (emphasis added).  But it explained that "the world of cloak and dagger is

not the world of pharmacology," and the standards applicable to [Exemptions 1

and 3]," where the mosaic theory applies, are not the same as those governing

Exemption 6."  *Id.*  The same considerations dictate rejecting the application of the

mosaic theory in the Exemption 4 context, where concerns about protecting the government's intelligence apparatus are inapplicable.

**C. The Bureau's Release Of Records In The *Execution Protocol Cases* Forecloses Its Confidentiality Claim Here As To Certain Information**

At a minimum, the Bureau can no longer claim confidential treatment as to drug concentrations or expiration dates because it has publicly disclosed this type of information elsewhere.

The Bureau previously released drug concentrations and expiration date information as part of partially-redacted lab reports it included in the administrative record in the *Execution Protocol Cases*.  Br. 40-41.  CREW learned of this only when the Bureau's counsel revealed this prior disclosure while drafting the Bureau's brief.  *Id.*  The Bureau argues that its prior public disclosure of concentrations and expiration dates does not defeat the confidentiality of that information in other documents, which CREW has requested and the Bureau continues to withhold.  *Id.*  But under the public domain doctrine, the Bureau's prior release of the drug concentration and expiration dates constitutes a waiver of its confidentiality claim as to this same information in other documents.

The availability of information in the public domain defeats application of an otherwise valid FOIA exemption claim.  *See, e.g.*, *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999).  To satisfy the public domain doctrine, a plaintiff must

"point[] to specific information in the public domain that appears to duplicate that being withheld."  *Afshar v. Department of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983).  The Bureau does not dispute that this test is satisfied here because CREW seeks in other records the same drug concentration and expiration date information that has already been publicly disclosed.  *Cf. Cottone*, 193 F.3d at 555; *Judicial Watch*, 525 F. Supp. 3d at 100-105.

Instead, the Bureau argues that the public domain doctrine only applies in connection with the now-defunct substantial competitive harm test and when the supplier of the information was itself responsible for public disclosure.  Br. 41. But the public domain doctrine cuts across FOIA contexts.  *See, e.g.*, *Cottone*, 193 F.3d at 554 ("[M]aterials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record.").  And the doctrine applies when the information was officially disclosed, regardless of whether the information supplier disclosed the information.  *See Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007) (information must be in the "public domain by *official* disclosure" (emphasis added)).

The very cases cited by Bureau refute its argument that the public domain doctrine only applies in connection with the substantial competitive harm test, and only when the information supplier released the information.  Br. 41-42.  One case cited by the Bureau, *CNA Financial Corp. v. Donovan*, 830 F.2d 1132, 1154 (D.C.

Cir. 1987), spoke broadly, stating that "[t]o the extent that any data requested under FOIA are in the public domain, the submitter is unable to make any claim to confidentiality—a *sine qua non* of Exemption 4." It did not peg this analysis to the pre-*Argus Leader* competitive harm test for confidentiality. Because the concentration and expiration date terms here were publicly released, the Bureau has no basis to claim that this information is typically kept private and designated as such, and that it provided (and honored) assurances of secrecy. *See Judicial Watch*, 525 F. Supp. 3d at 99 (applying *CNA Financial* in this fashion).

The other case cited by the Bureau, *Niagara Mohawk Power Corp. v. U.S. Department of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999), indicates, as other longstanding precedent does, that if the information "is truly public, then enforcement of an exemption cannot fulfill its purposes." *See also, e.g.*, *Cottone*, 193 F.3d at 554 (collecting cases). *Niagara Mohawk* says nothing to indicate that this principle applies only when the information supplier caused the information's release. The method of the prior public disclosure is relevant only if it resulted from "[u]nofficial leaks" or some other illegitimate means, which is not the case here. *Afshar*, 702 F.2d at 1130. The Bureau cannot avoid the public domain doctrine simply because it, and not the pentobarbital contractors, released the information CREW seeks.

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

/s/ Jessica A. Lutkenhaus
JESSICA A. LUTKENHAUS
ARI HOLTZBLATT
YOSEPH T. DESTA
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000
jessica.lutkenhaus@wilmerhale.com

NIKHEL S. SUS
CITIZENS FOR RESPONSIBILITY AND
    ETHICS IN WASHINGTON
1331 F Street NW, Suite 900
Washington, DC 20004
(202) 408-5565
nsus@citizensforethics.org

*Counsel for Appellant*

August 12, 2022

- 29 -

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 6,465 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word 2017 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of August, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Jessica A. Lutkenhaus*
JESSICA A. LUTKENHAUS